**UNITED STATES of America, Plaintiff,**

v.

**Manuel Antonio NORIEGA, et al., Defendants.**

**No. 88–79–CR.**

United States District Court, S.D. Florida.

June 8, 1990.

Michael P. Sullivan, Myles H. Malman, Asst. U.S. Attys., Miami, Fla., William C. Bryson, Deputy Sol. Gen., for the U.S.

Frank A. Rubino, Steven Kollin, Coconut Grove, Fla., Jon May, Miami, Fla., David Lewis, New York City, for defendant Manuel Antonio Noriega.

Samuel I. Burstyn, Miami, Fla., for defendant Luis Del Cid.

## OMNIBUS ORDER

HOEVELER, District Judge.

THIS CAUSE comes before the Court on the several motions of Defendants General Manuel Antonio Noriega and Lt. Col. Luis Del Cid to dismiss for lack of jurisdiction the indictment which charges them with various narcotics-related offenses.

The case at bar presents the Court with a drama of international proportions, considering the status of the principal defendant and the difficult circumstances under which he was brought before this Court. The pertinent facts are as follows:

On February 14, 1988, a federal grand jury sitting in Miami, Florida returned a twelve-count indictment charging General Manuel Antonio Noriega with participating in an international conspiracy to import cocaine and materials used in producing cocaine into and out of the United States. Noriega is alleged to have exploited his official position as head of the intelligence branch of the Panamanian National Guard, and then as Commander-in-Chief of the Panamanian Defense Forces, to receive payoffs in return for assisting and protecting international drug traffickers, including various members of the Medellin Cartel, in conducting narcotics and money laundering operations in Panama.

Specifically, the indictment charges that General Noriega protected cocaine shipments from Colombia through Panama to the United States; arranged for the transshipment and sale to the Medellin Cartel of ether and acetone, including such chemicals previously seized by the Panamanian Defense Forces; provided refuge and a base for continued operations for the members of the Medellin Cartel after the Colombian government's crackdown on drug traffickers following the murder of the Colombian Minister of Justice, Rodrigo Lara–Bonilla; agreed to protect a cocaine laboratory in Darien Province, Panama; and assured the safe passage of millions of dollars of narcotic proceeds from the United States into Panamanian banks. Noriega also allegedly traveled to Havana, Cuba and met with Cuban president Fidel Castro, who, according to the indictment, mediated a dispute between Noriega and the Cartel caused by the Panamanian troops' seizure of a drug laboratory that Noriega was paid to protect. All of these activities were allegedly undertaken for General Noriega's own personal profit. Defendant Del Cid, in addition to being an officer in the Panamanian

Defense Forces, was General Noriega's personal secretary. He is charged with acting as liaison, courier, and emissary for Noriega in his transactions with Cartel members and other drug traffickers.

Because of the activities alleged, Defendants are charged with engaging in a pattern of racketeering activity, in violation of the RICO statutes, 18 U.S.C. §§ 1962(c) and 1962(d); conspiracy to distribute and import cocaine into the United States, in violation of 21 U.S.C. § 963; and distributing and aiding and abetting the distribution of cocaine, intending that it be imported into the United States, in violation of 21 U.S.C. § 959 and 18 U.S.C. § 2. Defendant Noriega is further charged with aiding and abetting the manufacture of cocaine destined for the United States, in violation of 21 U.S.C. § 959 and 18 U.S.C. § 2; conspiring to manufacture cocaine intending that it be imported into the United States, in violation of 21 U.S.C. § 963; and causing interstate travel and use of facilities in interstate commerce to promote an unlawful activity, in violation of 18 U.S.C. § 1952(a)(3) and 18 U.S.C. § 2.

Subsequent to the indictment, the Court granted General Noriega's motion to allow special appearance of counsel, despite the fact that Noriega was a fugitive and not before the Court at that time. Noriega's counsel then moved to dismiss the indictment on the ground that United States laws could not be applied to a foreign leader whose alleged illegal activities all occurred outside the territorial bounds of the United States. Counsel further argued that Noriega was immune from prosecution as a head of state and diplomat, and that his alleged narcotics offenses constituted acts of state not properly reviewable by this Court.

Upon hearing arguments of counsel, and after due consideration of the memoranda filed, the Court denied Defendant's motion, for reasons fully set forth below. At that time, the Court noted that this case was fraught with political overtones, but that it was nonetheless unlikely that General Noriega would ever be brought to the United States to answer the charges against him.[1]

1. *United States v. Noriega,* 683 F.Supp. 1373 (S.D.Fla.1988).

The former observation proved to be considerably more correct than the latter, in light of subsequent events.

In the interval between the time the indictment was issued and Defendants were arrested, relations between the United States and General Noriega deteriorated considerably. Shortly after charges against Noriega were brought, the General delivered a widely publicized speech in which he brought a machete crashing down on a podium while denouncing the United States. On December 15, 1989, Noriega declared that a "state of war" existed between Panama and the United States. Tensions between the two countries further increased the next day, when U.S. military forces in Panama were put on alert after Panamanian troops shot and killed an American soldier, wounded another, and beat a Navy couple. Three days later, on December 20, 1989, President Bush ordered U.S. troops into combat in Panama City on a mission whose stated goals were to safeguard American lives, restore democracy, preserve the Panama Canal treaties, and seize General Noriega to face federal drug charges in the United States. Before U.S. troops were engaged, American officials arranged a ceremony in which Guillermo Endara was sworn in as president and recognized by the United States as the legitimate head of the government of Panama. Endara was reported to have won the Panamanian presidential election held several months earlier, the results of which were nullified and disregarded by General Noriega.

Not long after the invasion commenced, Defendant Del Cid, the commander of about two thousand Panamanian troops located in the Chiriqui Province, surrendered to American forces. He was then transferred into the custody of agents from the United States Drug Enforcement Agency, who thereupon arrested Del Cid for the offenses for which he is under indictment in this Court. The apprehension of General Noriega was not quite so easy. He successfully eluded American forces for several days, prompting the United States government to offer a one million dollar bounty for his capture. Eventually, the General took sanctuary in the Papal Nunci-ature in Panama City, where he apparently hoped to be granted political asylum. Noriega's presence in the Papal Nunciature touched off a diplomatic impasse and a round of intense negotiations involving several countries. Vatican officials initially refused to turn Noriega over to the United States. While he was still ensconced in the nunciature, American troops stationed outside pelted the building with loud rock-and-roll music blasted through loudspeakers. The music was played continuously for three days until church authorities protested the action as offensive. After an eleven-day standoff, Noriega finally surrendered to American forces, apparently under pressure from the papal nuncio and influenced by a threatening crowd of about 15,000 angry Panamanian citizens who had gathered outside the residence. On January 3, 1990, two weeks after the invasion began, Noriega walked out of the Papal Nunciature and surrendered himself to U.S. military officials waiting outside. He was flown by helicopter to Howard Air Force Base, where he was ushered into a plane bound for Florida and formally arrested by agents of the Drug Enforcement Agency. During the course of this litigation, which has included several hearings, no evidence was presented nor suggestion made that Noriega was in any way physically mistreated.

As is evident from the unusual factual background underlying this case, the Court is presented with several issues of first impression. This is the first time that a leader or de facto leader of a sovereign nation has been forcibly brought to the United States to face criminal charges. The fact that General Noriega's apprehension occurred in the course of a military action only further underscores the complexity of the issues involved. In addition to Defendant Noriega's motion to dismiss based on lack of jurisdiction over the offense and sovereign immunity, Defendants Noriega and Del Cid argue that they are prisoners of war pursuant to the Geneva Convention. This status, Defendants maintain, deprives the Court of jurisdiction to proceed with the case. Additionally, Noriega contends that the military action which

brought about his arrest is "shocking to the conscience", and that due process considerations require the Court to divest itself of jurisdiction over his person. Noriega also asserts that the invasion occurred in violation of international law. Finally, Noriega argues that, even in the absence of constitutional or treaty violations, the Court should dismiss the indictment pursuant to its supervisory powers so as to prevent the judicial system from being party to and tainted by the government's alleged misconduct in arresting Noriega.[2] The Court examines each of these issues, in turn, below.

## I. JURISDICTION OVER THE OFFENSE

The first issue confronting the Court is whether the United States may exercise jurisdiction over Noriega's alleged criminal activities. Noriega maintains that "the extraterritorial application of the criminal law is unreasonable under the unique facts of this case, and cannot be relied upon to secure jurisdiction over a leader of a sovereign nation who has personally performed no illegal acts within the borders of the United States."[3] Although the defendant attempts to weave his asserted status as a foreign leader into his challenge to the extraterritorial application of this country's criminal laws, the question of whether the United States may proscribe conduct which occurs beyond its borders is separate from the question of whether Noriega is immune from prosecution as a head of state. This distinction is made clear in the defendant's own discussion of the applicable international law on extraterritorial jurisdiction, which does not look to a foreign defendant's official status but rather to the nature and effect of the conduct at issue. The Court therefore reserves analysis of Noriega's claim to head of state immunity and confines its discussion here to the ability of the United States to reach and prosecute acts committed by aliens outside its territorial borders.[4] While the indictment cites specific instances of conduct occurring within the United States, including the shipment of cocaine from Panama to Miami and several flights to and from Miami by Noriega's alleged co-conspirators, the activity ascribed to Noriega occurred solely in Panama with the exception of the one trip to Cuba. Noriega is charged with providing safe haven to international narcotic traffickers by allowing Panama to be used as a location for the manufacture and shipment of cocaine destined for this country's shores.

Where a court is faced with the issue of extraterritorial jurisdiction, the analysis to be applied is 1) whether the United States has the power to reach the conduct in question under traditional principles of international law; and 2) whether the statutes under which the defendant is charged are intended to have extraterritorial effect. As Noriega concedes, the United States has long possessed the ability to attach criminal consequences to acts occurring outside this country which produce effects within the United States. *Strassheim v. Daily*, 221 U.S. 280, 285, 31 S.Ct. 558, 560, 55 L.Ed. 735 (1911); *Restatement (Third) of the Foreign Relations Law of the United States* [hereinafter *Restatement (Third)*] § 402(1)(c). For example, the United States would unquestionably

---

**2.** Defendant Del Cid's motion to dismiss based on alleged violations of the Posse Comitatus Act, the Mansfield Amendment, and the Fifth Amendment due process clause was subsequently withdrawn and is therefore not before the Court. *Defendant Del Cid's Notice of Withdrawal of Motion to Dismiss for Lack of Properly Effectuated Jurisdiction* (March 23, 1990).

**3.** *Defendant Noriega's Motion to Dismiss Indictment,* p. 9 (Sept. 15, 1988).

**4.** No jurisdictional obstacle would be present were the defendant a United States citizen, since a country may regulate the acts of its citizens wherever they occur. *United States v. Columba–Colella,* 604 F.2d 356, 358 (5th Cir.1979); *Blackmer v. United States,* 284 U.S. 421, 436–37, 52 S.Ct. 252, 254, 76 L.Ed. 375 (1932); *United States v. King,* 552 F.2d 833, 851 (9th Cir.1976), *cert. denied,* 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977); *United States v. Pizzarusso,* 388 F.2d 8, 10 (2d Cir.), *cert. denied,* 392 U.S. 936, 88 S.Ct. 2306, 20 L.Ed.2d 1395 (1968); *Rocha v. United States,* 288 F.2d 545, 548 (9th Cir.), *cert. denied,* 366 U.S. 948, 81 S.Ct. 1902, 6 L.Ed.2d 1241 (1961); *Restatement (Second) of the Foreign Relations Law of the United States,* § 30(1).

have authority to prosecute a person standing in Canada who fires a bullet across the border which strikes a second person standing in the United States. *See Restatement (Third)* § 402, Comment d. "All the nations of the world recognize 'the principle that a man who outside of a country willfully puts in motion a force to take effect in it is answerable at the place where the evil is done ...'" *Rivard v. United States*, 375 F.2d 882, 887 (5th Cir.) (citations omitted), *cert. denied*, 389 U.S. 884, 88 S.Ct. 151, 19 L.Ed.2d 181 (1967). The objective territorial theory of jurisdiction, which focuses on the effects or intended effects of conduct, can be traced to Justice Holmes' statement that "[a]cts done outside a jurisdiction, but intended to produce or producing effects within it, justify a State in punishing the cause of the harm as if he had been present at the effect, if the State should succeed in getting him within its power." *Strassheim v. Daily*, 221 U.S. at 285, 31 S.Ct. at 560. *See also Church v. Hubbart*, 6 U.S. (2 Cranch) 187, 234, 2 L.Ed. 249 (1804) ("[a nation's] power to secure itself from injury may certainly be exercised beyond the limits of its territory."). Even if the extraterritorial conduct produces no effect within the United States, a defendant may still be reached if he was part of a conspiracy in which some co-conspirator's activities took place within United States territory. *United States v. Baker*, 609 F.2d 134, 138 (5th Cir.1980). The former Fifth Circuit, whose decisions establish precedent for this Court, has on numerous occasions upheld jurisdiction over foreigners who conspired to import narcotics into the United States but never entered this country nor personally performed any acts within its territorial limits, as long as there was proof of an overt act committed within the United States by a co-conspirator. *See United States v. Postal*, 589 F.2d 862 (5th Cir.), *cert. denied*, 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 40 (1979); *United States v. Cadena*, 585 F.2d 1252 (5th Cir.1978); *United States v. Winter*, 509 F.2d 975 (5th Cir.), *cert. denied*, 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975); *Rivard v. United States, supra.*

More recently, international law principles have expanded to permit jurisdiction upon a mere showing of *intent* to produce effects in this country, without requiring proof of an overt act or effect within the United States. *See United States v. Wright–Barker*, 784 F.2d 161, 168 (3rd Cir. 1986); *United States v. Postal*, 589 F.2d at 886, n. 39; *United States v. Columba–Colella*, 604 F.2d at 358, 360. According to the *Restatement (Third):*

> Cases involving intended but unrealized effect are rare, but international law does not preclude jurisdiction in such instances, subject to the principle of reasonableness. When the intent to commit the proscribed act is clear and demonstrated by some activity, and the effect to be produced by the activity is substantial and foreseeable, the fact that a plan or conspiracy was thwarted does not deprive the target state of jurisdiction to make its law applicable.

§ 402, Comment d.

In the drug smuggling context, the 'intent doctrine' has resulted in jurisdiction over persons who attempted to import narcotics into the United States but never actually succeeded in entering the United States or delivering drugs within its borders. The fact that no act was committed and no repercussions were felt within the United States did not preclude jurisdiction over conduct that was clearly directed at the United States. *United States v. Wright–Barker, supra* ("The purpose of these [narcotics laws] is to halt smugglers *before* they introduce their dangerous wares into and distribute them in this country.") (emphasis in original); *United States v. Quemener*, 789 F.2d 145, 156 (2d Cir.), *cert. denied*, 479 U.S. 829, 107 S.Ct. 110, 93 L.Ed.2d 58 (1986); *United States v. Loalza–Vasquez*, 735 F.2d 153, 156 (5th Cir.1984); *United States v. Baker*, 609 F.2d at 138–39.

■ These principles unequivocally support jurisdiction in this case. The indictment charges Noriega with conspiracy to import cocaine into the United States and alleges several overt acts performed within the United States in furtherance of the conspiracy. Specifically, the indictment alleges that co-conspirators of Noriega pur-

chased a Lear jet in Miami, which was then used to transport drug proceeds from Miami to Panama. Moreover, Noriega's activities in Panama, if true, undoubtedly produced effects within this country as deleterious as the hypothetical bullet fired across the border. The indictment alleges that, as a result of Noriega's facilitation of narcotics activity in Panama, 2,141 pounds of cocaine were illegally brought into Miami from Panama. While the ability of the United States to reach and proscribe extraterritorial conduct having effects in this country does not depend on the amount of narcotics imported into the United States or the magnitude of the consequences, the importation of over 2,000 pounds of cocaine clearly has a harmful impact and merits jurisdiction. Finally, even if no overt acts or effects occurred within the territorial borders, the object of the alleged conspiracy was to import cocaine into the United States and therefore an intent to produce effects is present.

The defendant's argument that the exercise of jurisdiction over his alleged activities in Panama is unreasonable is simply unsupportable in light of established principles of international law and the overwhelming case law in this Circuit upholding jurisdiction under similar circumstances.[5] Other than asserting his status as a foreign leader, which presents a different question from the one posed here, Noriega does not distinguish this case from those cited above. He cites the principle of reasonableness recently articulated in the *Restatement (Third)* § 403, but fails to say how extending jurisdiction over his conduct would be unreasonable. In fact, the defen-

dant's invocation of a reasonableness requirement supports rather than undermines the application of jurisdiction in the present case. Thus, for example, Noriega quotes the following language from the *Restatement:*

> In applying the principle of reasonableness, the exercise of criminal (as distinguished from civil) jurisdiction in relation to acts committed in another state may be perceived as particularly intrusive.

> \* \* \* \* \* \*

> It is generally accepted by enforcement agencies of the United States government that criminal jurisdiction over activity with substantial foreign elements should be exercised more sparingly than civil jurisdiction over the same activity, and only upon strong justification.

*Restatement (Third)* § 403, Reporters' Note 8. However, the same section of the *Restatement* establishes that narcotics offenses provide the strong justification meriting criminal jurisdiction: "Prosecution for activities committed in a foreign state have generally been limited to serious and universally condemned offenses, such as treason or traffic in narcotics, and to offenses by and against military forces. In such cases the state in whose territory the act occurs is not likely to object to regulation by the state concerned." *Id.* (citations omitted). The *Restatement* therefore explicitly recognizes the reasonableness of extending jurisdiction to narcotics activity such as that alleged here. *See also United States v. Wright–Barker,* 784 F.2d at 168 (construing § 403 to permit jurisdiction

---

5. Defendant's citation to *United States v. Bank of Nova Scotia* for the proposition that extraterritorial jurisdiction must be exercised delicately does not balance in his favor. In that case, which involved a grand jury subpoena served upon a Canadian-chartered bank located in the Bahamas, the Eleventh Circuit acknowledged that enforcing the subpoena might provoke international friction but nonetheless held that it "simply cannot acquiesce in the proposition that United States criminal investigations must be thwarted whenever there is a conflict with the interest of other states." 691 F.2d 1384, 1391 (11th Cir.1982) (quoting *In re Grand Jury Proceedings (Field),* 532 F.2d 404, 410 (5th Cir.), *cert. denied,* 429 U.S. 940, 97 S.Ct. 354, 50 L.Ed.2d 309 (1976)), *cert. denied,* 462 U.S. 1119,

103 S.Ct. 3086, 77 L.Ed.2d 1348 (1983)). *Bank of Nova Scotia* is therefore in accord with the cases cited above.

Similarly unpersuasive is Defendant's reference to a legal treatise arguing that the effects doctrine should *not* be applied to extraterritorial conduct resulting in "more or less remote repercussions." *See* Jennings, *Extraterritorial Jurisdiction and the United States Antitrust Laws,* 33 Brit.Y.B.C.L. 146, 159 (1957). Since Noriega is alleged to have conspired to import narcotics *into* the United States, the delivery of over 2,000 pounds of cocaine into Miami—far from being a 'remote repercussion' of the conspiracy—is in fact a direct and intended result of his alleged activities in Panama.

over extraterritorial narcotics trafficking). Even if another state were likely to object to jurisdiction here, the United States has a strong interest in halting the flow of illicit drugs across its borders. In assessing the reasonableness of extraterritorial jurisdiction, one of the factors to be considered is the character of the activity to be regulated, including the importance of regulation to the regulating state and the degree to which the desire to regulate is generally accepted. *Restatement (Third)* § 403(1)(c). The consensus of the American public on the need to stem the flow of drugs into this country is well publicized and need not be elaborated upon in detail. Further, the Court notes that the United States has an affirmative duty to enact and enforce legislation to curb illicit drug trafficking under the Single Convention on Narcotics Drugs, 18 U.S.T. 1409, T.I.A.S. No. 6298, New York, March 30, 1961, ratified by the United States, 1967, amended 26 U.S.T. 1441, T.I.A.S. No. 8118. *See In re Grand Jury Proceedings Bank of Nova Scotia,* 740 F.2d 817, 830–31 (11th Cir.1984), *cert. denied,* 469 U.S. 1106, 105 S.Ct. 778, 83 L.Ed.2d 774 (1985) (discussing the Single Convention on Narcotics Drugs). Given the serious nature of the drug epidemic in this country, certainly the efforts of the United States to combat the problem by prosecuting conduct directed against itself cannot be subject to the protests of a foreign government profiting at its expense. In any case, the Court is not made aware of any instance in which the Republic of Panama objected to the regulation of drug trafficking by the United States. In sum, because Noriega's conduct in Panama is alleged to have resulted in a direct effect within the United States, the Court concludes that extraterritorial jurisdiction is appropriate as a matter of international law.

This conclusion does not end the Court's analysis, however, since a further requirement is that the criminal statutes under which the defendant is charged be intended to apply to conduct outside the United States. Noriega is charged with violations of 21 U.S.C. § 959 (distributing a controlled substance with the knowledge that it would be unlawfully imported into the United States); 21 U.S.C. § 952 (importing a controlled substance into the United States from a place outside thereof); 21 U.S.C. § 963 (conspiring to commit the above offenses); and 18 U.S.C. § 2 (aiding and abetting the violation of § 959). The indictment also alleges that Noriega participated in a pattern of racketeering activity consisting of the above crimes, in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), §§ 1962(c) and 1962(d), and caused the travel and use of facilities in interstate and foreign commerce in furtherance of a narcotics conspiracy, in violation of 18 U.S.C. § 1952(a)(3).

■ Section 959, prohibiting the distribution of narcotics intending that they be imported into the United States, is clearly meant to apply extraterritorially. The statute expressly states that it is "intended to reach acts of manufacture or distribution committed outside the territorial jurisdiction of the United States." 21 U.S.C. § 959(c). The remaining statutes, by contrast, do not on their face indicate an express intention that they be given extraterritorial effect. Where a statute is silent as to its extraterritorial reach, a presumption against such application normally applies. *United States v. Benitez,* 741 F.2d 1312, 1316–17 (11th Cir.1984), *cert. denied,* 471 U.S. 1137, 105 S.Ct. 2679, 86 L.Ed.2d 698 (1985). However, "such statutes may be given extraterritorial effect if the nature of the law permits it and Congress intends it. Absent an express intention on the face of the statutes to do so, the exercise of that power may be inferred from the nature of the offenses and Congress' other legislative efforts to eliminate the type of crime involved." *United States v. Baker,* 609 F.2d at 136. (citing *United States v. Bowman,* 260 U.S. 94, 97–98, 43 S.Ct. 39, 41, 67 L.Ed. 149 (1922).

■ With respect to 21 U.S.C. § 952, it is apparent from the very nature of the offense that the statute was intended to reach extraterritorial acts. Section 952 makes it unlawful to import narcotics "into the United States from *any place outside* thereof .." (emphasis added). Because importation by definition involves acts originating outside of the territorial limits of

the United States, the Court can only infer that § 952 applies to conduct which begins abroad; any interpretation to the contrary would render the statute virtually meaningless. *United States v. Cadena*, 585 F.2d at 1259. With jurisdiction over the substantive violations of §§ 959 and 952 established, jurisdiction over the conspiracy and aiding and abetting counts likewise follows. Since a conspiracy to commit an offense is closely related to the offense itself, courts have regularly inferred the extraterritorial reach of the § 963 conspiracy statute on the basis of a finding that the substantive statutes apply abroad. *See, e.g., Chua Han Mow v. United States*, 730 F.2d 1308, 1311 (9th Cir.1984), *cert. denied*, 470 U.S. 1031, 105 S.Ct. 1403, 84 L.Ed.2d 790 (1985); *United States v. Baker*, 609 F.2d at 139. The same must be said for an aiding and abetting charge; if anything, the act of aiding and abetting is even more intimately connected to the underlying crime. In short, the Court perceives no sound jurisdictional reason for distinguishing the conspiracy and aiding and abetting charges from the substantive offense for purposes of extraterritorial application. Section 963 and 18 U.S.C. § 2 must therefore be given extraterritorial effect as well.

■ Whether the RICO and Travel Act statutes reach conduct abroad is a more difficult question. None of the cases cited by the parties address this point and the Court is unaware of any case reaching the

issue.[6] The question of these statutes' extraterritorial effect is therefore a matter of apparent first impression. For the reasons stated below, the Court finds that RICO, 18 U.S.C. §§ 1962(c) and (d), and the Travel Act, 18 U.S.C. § 1952(a)(3), apply to conduct outside the United States.

Section 1962(c) makes it unlawful for "*any* person associated with *any* enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate ... in the conduct of such enterprise's affairs through a pattern of racketeering activity ..." 18 U.S.C. § 1962(c) (emphasis added). Section 1962(d) similarly makes it illegal for "*any* person to conspire to violate" Section 1962(c). 18 U.S.C. § 1962(d) (emphasis added). These prohibitions are on their face all-inclusive and do not suggest parochial application. Indeed, if any statute reaches far and wide, it is RICO.[7]

When Congress passed RICO, it was primarily concerned with eradicating the destructive influence of organized crime on our society:

(1) organized crime in the United States ... annually drains billions of dollars from America's economy ... (3) this money and power are increasingly used to infiltrate and corrupt legitimate business and labor unions and to subvert and corrupt our democratic processes; (4) organized crime activities in the United States weaken the stability of the Na-

6. In *Republic of Philippines v. Marcos (Marcos II)*, the Philippine government brought a RICO action against deposed president Ferdinand Marcos and his wife Imelda for allegedly converting funds belonging to the Philippine people for their own personal use. The *indictment* charged that some of the funds were invested in properties in the United States and that other monies and valuables were transported to Hawaii upon the Marcos' arrival there. On the question of RICO's applicability, the court in dicta suggested that the Marcos' alleged conduct in the Philippines could not be reached but did not ultimately decide the issue since it upheld jurisdiction based upon the Marcos' alleged transportation of stolen property into the United States. The holding in that case thus provides little, if any, guidance on the issue. 818 F.2d 1473, 1478–79 (9th Cir.1987), *op. withdrawn, reh. gr., rev'd on other grounds on reh. en banc, Republic of Philippines v. Marcos (Marcos III)*, 862 F.2d 1355 (9th Cir.1988), *cert. denied,* —

U.S. ——, 109 S.Ct. 1933, 104 L.Ed.2d 404 (1989).

7. Much has been written and said about RICO's extensive reach in a manner perhaps unforseen at the time of its enactment. Recently, for example, RICO actions have been brought against anti-abortion protestors seeking to block access to abortion and family planning clinics. *See, e.g., West Hartford v. Operation Rescue*, 726 F.Supp. 371 (D.Conn.1989); *Feminist Women's Health Center v. Roberts*, 1988 WL 156656, 1988 U.S. Dist. LEXIS 16325 (W.D.Wash.1988); *see generally*, Melley, *Stretching of civil RICO: Pro-life demonstrators are racketeers*, 56 UMKC L.Rev. 287 (1988). But "the fact that RICO has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." *Haroco Inc. v. American National Bank & Trust Co.*, 747 F.2d 384, 398 (7th Cir.1984), *aff'd*, 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985).

tion's economic system, harm innocent investors and competing organizations, interfere with free competition, seriously burden interstate and foreign commerce, and undermine the general welfare of the Nation and its citizens.

RICO Statement of Findings and Purpose, Pub.L. No. 91–452, 84 Stat. 922 (1970), 91st Cong., 2d Sess., reprinted in 1970 U.S.Code Cong. & Admin.News 1073, 1073. Though its emphasis is on economic effects, RICO itself is not so limited; it's history demonstrates concern with our domestic security and welfare as well as our gross national product. *Marcos III*, 862 F.2d at 1366 (Schroeder, Circuit Judge, concurring in part and dissenting in part).

While the Statement of Findings and Purpose speaks of criminal activities "in the United States," the Court must be cognizant of the overall purpose of the Act and the extent to which Congress intended it have effect. The legislative history leaves no doubt that RICO was to be read expansively as a means of attacking organized crime at every level and on an unprecedented scope. Congress noted that:

> What is needed here ... are new approaches that will deal not only with individuals, but also with the economic base through which those individuals constitute such a serious threat to the economic well-being of the Nation. In short, an attack must be made on their source of economic power itself, and the attack must take place *on all available fronts.*

S.Rep. No. 91–617, p. 76 (1969) (emphasis added). It is in this spirit of attacking crime "on all fronts" that all of the Act's provisions must be read. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 498, 105 S.Ct. 3275, 3286, 87 L.Ed.2d 346 (1985). Congress specifically admonished that "RICO be liberally construed to effectuate its remedial purpose," [8] and toward that end consciously constructed RICO in expansive and far-reaching language. As the Seventh Circuit has observed:

> [I]n RICO, we confront a statute which is ... above all, deliberately and extraordinarily broad ...

In defining the key terms of the statute, such as 'person,' 'enterprise,' and 'racketeering activity,' and in leaving undefined such broad terms as 'conduct' and 'participate,' Congress deliberately chose to employ broad terms which would defy judicial confinement ... Congress [chose] to employ that extraordinarily broad language in order to achieve its desired goals. In response to suggestions that the statute be more narrowly tailored to prevent unexpected applications, Congress clearly preferred breadth to precision.

*Haroco Inc. v. American National Bank & Trust Co.*, 747 F.2d at 398.

Given the Act's broad construction and equally broad goal of eliminating the harmful consequences of organized crime, it is apparent that Congress was concerned with the effects and not the locus of racketeering activities. The Act thus permits no inference that it was intended to apply only to conduct within the United States. Such a narrow construction would frustrate RICO's purpose by allowing persons engaged in racketeering activities directed at the United States to escape RICO's bite simply by moving their operations abroad. Yet in the context of narcotics activities, perhaps the greatest threat to this country's welfare comes from enterprises outside the United States such as the Colombian cocaine cartels. Keeping in mind Congress' specific instruction that RICO be applied liberally to effect its remedial purpose, the Court cannot suppose that RICO does not reach such harmful conduct simply because it is extraterritorial in nature. As long as the racketeering activities produce effects or are intended to produce effects in this country, RICO applies.

Noriega is also charged with violating the Travel Act, 18 U.S.C. § 1952(a)(3), by causing foreign travel and the use of facilities in foreign and interstate commerce to promote an unlawful activity. The indictment alleges that, on two separate occasions, co-conspirators of Noriega used an airplane to transport drug proceeds from Miami to Panama.

---

8. Pub.L. No. 91–452, § 904(a), 84 Stat. 947.

Like RICO, the Travel Act was originally designed to combat organized crime. Specifically, "the purpose of the Travel Act was to aid local law enforcement officials. In many instances, the 'top men' of a given criminal enterprise resided in one State but conducted their illegal activities in another; by creating a federal interest in limiting the interstate movement necessary to such operations, criminal conduct beyond the reach of local officials could be controlled." *United States v. Nardello,* 393 U.S. 286, 290, 89 S.Ct. 534, 536, 21 L.Ed.2d 487 (1969). The Act was thus an attempt to reach criminal activities uniquely broad and transitory in scope, i.e., those whose influence extend beyond state and national borders and therefore require federal assistance. S.Rep. No. 644, 87th Cong., 1st Sess., 4 (1961). While courts have sometimes, as above, referred to persons "residing in one state," the Act itself indicates no such territorial limitation; the reference is therefore more properly understood as calling attention to the interstate character of the activity rather than the defendant's location. Stated more broadly, the Act "constitutes an effort to deny individuals who act for criminal purposes access to the channels of commerce." *Erlenbaugh v. United States,* 409 U.S. 239, 246, 93 S.Ct. 477, 482, 34 L.Ed.2d 446 (1972).

In this case, the defendant allegedly participated in a criminal syndicate which utilized the channels of commerce to carry out illegal drug activities in the United States. His location may have differed from the typical defendant charged under the Travel Act but the nature and effect of the alleged activity is the same, and implicates the same congressional desire to reach conduct which transcends state lines both physically and symbolically.

Support for extraterritorial application of § 1952(a)(3) is also found in the statutory language, which suggests no restriction based upon the locus of conduct other than that it result in activity crossing state lines: [9]

The words of section 1952 are general; they contain no restriction to particular persons or to particular kinds of gambling, liquor, narcotics, and prostitution offenses.

... [A]s we read the legislative record, Congress meant exactly what the language of Section 1952 states—it deliberately chose to make the statute applicable generally, and without crippling restrictions, to any person engaged in any kind of illicit business enterprise in one of the four fields of activity specified in the statute, which experience showed to be those in which organized racketeers commonly engaged.

*United States v. Roselli,* 432 F.2d 879, 885 (9th Cir.1970), *cert. den.,* 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971). The precise issue in *Roselli* involved the Travel Act's application to criminal activity notwithstanding the defendant's lack of participation in a traditional organized syndicate, but the court's analysis of the statute's liberal coverage seemingly applies here as well.[10] In short, the Court finds that

---

**9.** 18 U.S.C. § 1952 provides in pertinent part:

(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

(1) distribute the proceeds of any unlawful activity; or

(2) commit any crime of violence to further any unlawful activity; or

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

(b) As used in this section "unlawful activity" means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics or controlled substances (as defined in section 102(6) of the Controlled Substances Act), or prostitution offenses in violation of the laws of the State in which they are committed or of the United States (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States, or (3) any act which is indictable under subchapter II of chapter 53 of title 31, United States Code, or under section 1956 or 1957 of this title.

**10.** The Court is, of course, mindful that the Supreme Court has cautioned that Congress did not intend "a broadranging interpretation of § 1952." *Rewis v. United States,* 401 U.S. 808,

where, as here, the defendant causes interstate travel or activity to promote an unlawful purpose, § 1952(a)(3) applies, whether or not the defendant is physically present in the United States.

Jurisdiction over Defendant's extraterritorial conduct is therefore appropriate both as a matter of international law and statutory construction.

## II. SOVEREIGN IMMUNITY

The Court next turns to Noriega's assertion that he is immune from prosecution based on head of state immunity, the act of state doctrine, and diplomatic immunity.

### A. Head of State Immunity

█ Grounded in customary international law, the doctrine of head of state immunity provides that a head of state is not subject to the jurisdiction of foreign courts, at least as to official acts taken during the ruler's term of office. *In re Grand Jury Proceedings, Doe # 700*, 817 F.2d 1108, 1110 (4th Cir.), *cert. denied*, 484 U.S. 890, 108 S.Ct. 212, 98 L.Ed.2d 176 (1987); *In re Doe*, 860 F.2d 40, 44–45 (2d Cir.1988). The rationale behind the doctrine is to promote international comity and respect among sovereign nations by ensuring that leaders are free to perform their governmental duties without being subject to detention, arrest, or embarrassment in a foreign country's legal system.[11] *In re Grand Jury Proceedings, Doe # 700*, 817 F.2d at 1110; *see generally*, Note, *Resolving the Confusion Over Head of State Immunity; The*

*Defined Right of Kings*, 86 Colum.L.Rev. 169, 171–79 (1986).

█ In order to assert head of state immunity, a government official must be recognized as a head of state. Noriega has never been recognized as Panama's Head of State either under the Panamanian Constitution or by the United States. Title VI, Article 170 of the Panamanian Constitution provides for an executive branch composed of the President and Ministers of State, neither of which applies to Noriega. Officially, Noriega is the *Commandante* of the Panamanian Defense Forces,[12] but he was never elected to head Panama's government and in fact abrogated the Panamanian presidential elections of May 7, 1989. More importantly, the United States government has never accorded Noriega head of state status, but rather continued to recognize President Eric Arturo Delvalle as the legitimate leader of Panama while Noriega was in power. As this Court held in a previous case involving the Republic of Panama, the Executive's decision to recognize President Delvalle and not the Defendant as Panama's head of state is binding on the Court. *Republic of Panama v. Air Panama*, 745 F.Supp. 669 (S.D.Fla.1988). The ruling in that case—which I find no reason to depart from here—was based on a line of case law holding that recognition of foreign governments and their leaders is a discretionary foreign policy decision committed to the Executive Branch and thus conclusive upon the courts. *See Republic of Panama v. Citizens and Southern Int'l. Bank*, 682 F.Supp. 1544, 1545 (S.D.

812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971). That admonition has, however, been issued where the defendants themselves did not directly cause or engage in interstate activity, and where the interstate component was marginal at best. *See United States v. Kahn*, 472 F.2d 272, 285 (2d Cir.), *cert. denied*, 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958 (1973). The Court was thus wary that the Travel Act not be used to target primarily local activity and thereby upset the federal-state balance—a concern not present in the instant case.

**11.** Given this rationale, there is ample doubt whether head of state immunity extends to private or criminal acts in violation of U.S. law. *See In re Doe*, 860 F.2d at 45; *In re Grand Jury Proceedings, Doe # 700*, 817 F.2d at 1111; *Repub-*

*lic of Philippines v. Marcos (Marcos I)*, 806 F.2d 344, 360 (2d Cir.1986). Criminal activities such as the narcotics trafficking with which Defendant is charged can hardly be considered official acts or governmental duties which promote a sovereign state's interests, especially where, as here, the activity was allegedly undertaken for the sole personal benefit of the foreign leader. In light of the Court's disposition on other grounds, however, it reserves discussion of this issue for Defendant's act of state defense, *infra*.

**12.** The Panamanian Defense Forces are a creation of Noriega's under which he combined the National Guard, other Panamanian military and police forces, and some bureaucratic departments.

Fla.1988); *Ex parte Republic of Peru,* 318 U.S. 578, 589, 63 S.Ct. 793, 800, 87 L.Ed. 1014 (1943); *Banco De Espana v. Federal Reserve Bank,* 114 F.2d 438, 442 (2d Cir. 1940); *Guaranty Trust Co. v. United States,* 304 U.S. 126, 137, 58 S.Ct. 785, 791, 82 L.Ed. 1224 (1938); *United States v. Belmont,* 301 U.S. 324, 328, 57 S.Ct. 758, 759–60, 81 L.Ed. 1134 (1937); *Jones v. United States,* 137 U.S. 202, 212–214, 11 S.Ct. 80, 83–84, 34 L.Ed. 691 (1890). *See also Republic of Mexico v. Hoffman,* 324 U.S. 30, 35–36, 65 S.Ct. 530, 532–33, 89 L.Ed. 729 (1945) ("It is therefore not for the courts to deny an immunity which our government has seen fit to allow, or allow an immunity on new grounds which the government has not seen fit to recognize.").

■■■ Aside from the fact that neither Panama nor the United States recognizes Noriega as a head of state, the defendant concedes that he does not fit within traditional notions of a head of state as defined by customary international law.[13] He nonetheless argues that he is entitled to head of state immunity as the *de facto* ruler of Panama, "regardless of the source of his power or the nature of his rule." The defendant cites numerous newspaper reports and excerpts of congressional testimony to the effect that Noriega effectively controlled Panama. In fact, this Court has previously acknowledged that, despite the official recognition of Delvalle, Noriega was the *de facto* head of Panama's government. *United States v. Noriega,* 683 F.Supp. at 1374, n. 3. But simply because Noriega may have in fact run the country

of Panama does not mean he is entitled to head of state immunity, since the grant of immunity is a privilege which the United States may withhold from any claimant.[14] *The Schooner Exchange v. M'Faddon,* 11 U.S. (7 Cranch) 116, 3 L.Ed. 287 (1812); Note, *Defined Right of Kings, supra* at 188 ("A 'head of state' should be defined as the political or ceremonial head of a government *recognized by the United States.* Because states grant immunity from their jurisdiction as a privilege, the United States would not extend immunity to officials of governments with which it does not have diplomatic relations.") (emphasis added). Indeed, deference to the Executive branch in matters concerning relations with foreign nations is the primary rationale supporting immunity for heads of state. *See Republic of Mexico v. Hoffman, supra; In re Doe,* 860 F.2d at 45. Since the only reason Noriega would be entitled to immunity as a head of state is because of such judicial deference to the Executive, his claim to a "right" of immunity against the express wishes of the Government is wholly without merit.

The "head of state" argument comes to the Court unencumbered by evidence; the arguments were made largely on the basis of general information made available by the media. However, accepting as true statements of counsel regarding Defendant's position of power, to hold that immunity from prosecution must be granted "regardless of his source of power or nature of rule" would allow illegitimate dictators

---

**13.** The provision of customary international law cited by Defendant as an acceptable definition of a head of state would not include Noriega. The Convention on the Prevention and Punishment of Crimes Against Internationally Protected Persons, Including Diplomatic Agents (T.I.A.S. No. 8532; 28 U.S.T.1975) defines "internationally protected person" as "(a) a Head of State, including any member of a collegial body performing the functions of a Head of State under the constitution of the State concerned, a Head of Government or a Minister of Foreign Affairs ..." Noriega has not shown that he was either the ceremonial or official head of government, and he does not otherwise fulfill the definition.

**14.** This principle undermines Defendant's reliance on the government's position in *Republic*

*of Philippines by Central Bank of Philippines v. Marcos,* 665 F.Supp. 793 (N.D.Cal.1987). There, the government moved to quash a deposition subpoena served on the Philippine Solicitor General by unsuccessfully arguing that the Solicitor General qualified for head of state immunity. Noriega maintains that his status as *de jure* Commander in Chief of the Panamanian Defense Forces and *de facto* head of the Panamanian government is at least as high as a solicitor general and therefore qualifies him for *head of state immunity. Since,* as explained above, head of state immunity is a privilege bestowed within the Executive's discretion, the government is not bound to a position it has taken on another foreign official in an entirely different context.

the benefit of their unscrupulous and possibly brutal seizures of power. No authority exists for such a novel extension of head of state immunity, and the Court declines to create one here. Since the United States has never recognized General Noriega as Panama's head of state, he has no claim to head of state immunity.

## B. The Act of State Doctrine

■ Noriega next argues that the act of state doctrine prohibits the Court from adjudicating the legality of his official actions in Panama. Unlike head of state immunity, the act of state doctrine presents no jurisdictional question but instead addresses the Court's permissible scope of inquiry into certain governmental acts. It is more properly understood as an issue preclusion device rather than an immunity prohibiting prosecution. *Restatement (Third)* § 443, Reporters' Note 11. *See also National American Corp. v. Federal Republic of Nigeria,* 448 F.Supp. 622, 640 n. 30 (S.D.N.Y.1978) (contrasting sovereign immunity with the act of state doctrine), *aff'd,* 597 F.2d 314 (2d Cir.1979).

The classic expression of the doctrine is stated in *Underhill v. Hernandez:* "Every sovereign is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgement on the acts of the government of another done within its own territory." 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897). More than 60 years later, the Supreme Court reaffirmed the doctrine in *Banco Nacional de Cuba v. Sabbatino,* in which case the Court refused to examine the Cuban government's taking of property in Cuba owned by a Cuban corporation without compensation. 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). *See also Frolova v. Union of Soviet Socialist Republics,* 558 F.Supp. 358, 364 (N.D.Ill.1983) (act of state doctrine barred court from examining the Soviet Union's refusal to allow plaintiff's husband to emigrate to the United States), *aff'd,* 761 F.2d 370 (7th Cir.1985); *Banco De Espana v. Federal Reserve Bank,* 114 F.2d at 443 (court may not determine whether Spanish Finance Minister's alleged diversion of silver was illegal under Spanish law); *Hatch v. Baez,* 7 Hun. 596 (N.Y.Sup.Ct.1876) (doctrine prevented court from reviewing acts of former president of the Dominican Republic in his official capacity).

Although stated in terms of acts of the "State" or "sovereign," the doctrine also extends to governmental acts of State officials vested with sovereign authority. *Bernstein v. Van Heyghen Freres, S.A.,* 163 F.2d 246, 249 (2d Cir.), *cert. denied,* 332 U.S. 772, 68 S.Ct. 88, 92 L.Ed. 357 (1947); *Banco De Espana v. Federal Reserve Bank,* 114 F.2d at 444. Whether such officials and their governments need be recognized or "accepted" as such is unclear. The Court in *Underhill, supra,* held that the act of state doctrine "[cannot] be confined to lawful or recognized governments ... The immunity of individuals from suits brought in foreign tribunals for acts done within their own states, in the exercise of governmental authority, whether as civil officers or military commanders, must necessarily extend to agents of governments ruling by paramount force as a matter of fact." 168 U.S. at 252, 18 S.Ct. at 84. *Sabbatino,* however, indicates otherwise: "[T]he Judicial Branch will not examine the validity of a taking of property within its own territory by a sovereign foreign government, *extant and recognized by this country at the time of suit* ..." 376 U.S. at 428, 84 S.Ct. at 940. (emphasis added). Resolution of the two cases is unnecessary at this time, however, in light of the Court's disposition below.

■ In order for the act of state doctrine to apply, the defendant must establish that his activities are "acts of state," i.e., that they were taken on behalf of the state and not, as private acts, on behalf of the actor himself. *Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 694, 96 S.Ct. 1854, 1861, 48 L.Ed.2d 301 (1976). "That the acts must be *public* acts of the *sovereign* has been repeatedly affirmed." *Marcos I,* 806 F.2d at 358. (emphasis in original). Though the distinction between the public and private acts of government officials may prove elusive, this difficulty has not prevented courts from scrutinizing the character of

the conduct in question. *Id.* at 359 (distinguishing deposed Philippine President Ferdinand Marcos' acts as head of state from his purely private acts); *Dunhill,* 425 U.S. at 695, 96 S.Ct. at 1862 (commercial activities are not acts of state); *Sharon v. Time, Inc.,* 599 F.Supp. 538, 544–45 (S.D.N.Y. 1984) (Defense Minister's alleged support of massacre was not the policy of Israeli government and therefore not an act of state); *De Roburt v. Gannett Co.,* 733 F.2d 701, 704 (9th Cir.1984) (act of state doctrine does not apply to foreign ruler's private, unofficial acts), *cert. denied,* 469 U.S. 1159, 105 S.Ct. 909, 83 L.Ed.2d 923 (1985); *Jimenez v. Aristeguieta,* 311 F.2d 547, 557–58 (5th Cir.1962) (foreign dictator's financial crimes were for his own personal benefit and therefore were not public acts sufficient to invoke act of state defense), *cert. denied,* 373 U.S. 914, 83 S.Ct. 1302, 10 L.Ed.2d 415 (1963).

 The Court fails to see how Noriega's alleged drug trafficking and protection of money launderers could conceivably constitute public action taken on behalf of the Panamanian state. Certainly no evidence has been presented to this effect, despite Defendant's burden of proof on the issue. *Dunhill,* 425 U.S. at 694, 96 S.Ct. at 1861. The indictment in this case charges a series of private acts committed by the defendant for his own personal financial enrichment. It does not allege, and cannot reasonably be construed to charge, that Noriega participated in a racketeering enterprise and conspired to import cocaine into the United States in furtherance of Panama's state policy or to serve some overriding national interest. The fact that Noriega is alleged to have utilized his official position to engage in criminal activity does not, as Defendant suggests, cast his actions in a public light; as we well know, government officials are as capable of exploiting their positions of power for private, selfish ends as they are for public purpose. The inquiry is not whether Noriega used his official position to engage in the challenged acts, but whether those acts were taken on behalf of Noriega instead of Panama.

Defendant does little more than state that, as the de facto ruler of Panama, his actions constitute acts of state. This sweeping position completely ignores the public/private distinction and suggests that government leaders are, as such, incapable of engaging in private, unofficial conduct. Aside from its lack of logic, suffice it to say that this argument has been implicitly rejected in several cases distinguishing the private from public conduct of heads of state and foreign dictators. *See Marcos I,* 806 F.2d at 359; *Marcos III,* 862 F.2d at 1361; *De Roburt v. Gannett Co.,* 733 F.2d at 704; *Jimenez,* 311 F.2d at 557–58. The notion that Noriega, qua dictator, was essentially the sovereign and that all of his acts are therefore acts of state is most thoroughly undermined by the *Jimenez* case, *supra,* an authoritative precedent directly contrary to Noriega's position. In that case, the Republic of Venezuela alleged that Jimenez, its former president and dictator, had used his position to commit financial crimes for his own personal benefit. Jimenez contended "that as a 'dictator' he himself would be the sovereign— the government of Venezuela—and that all his acts constituting the financial crimes with which he is charged ... are acts of state or sovereign acts ..." *Id.* at 557. The Fifth Circuit took issue:

> Even though characterized as a dictator, appellant was not himself the sovereign—government—of Venezuela within the Act of State Doctrine. He was chief executive, a public officer, of the sovereign nation of Venezuela. It is only when officials having sovereign authority act in an official capacity that the Act of State Doctrine applies.
>
> Appellant's acts constituting the financial crimes ... were not acts of Venezuela sovereignty ... [E]ach of these acts was "for the private financial benefit" of the appellant. They constituted common crimes committed by the Chief of State in violation of his position and not in pursuance of it. They are as far from being an act of state as rape ...

*Id.* at 557–58.

No fundamental difference separates this case from *Jimenez.* Nor is the Court persuaded by the Ninth Circuit's decision in *Marcos II, supra,* upon which Defendant

heavily relies. The court in that case held that deposed dictator Ferdinand Marcos' alleged theft and conversion of property and funds belonging to the Philippine republic were acts of state since "they are activities that Marcos could only have undertaken pursuant to his powers as President of the Philippines." 818 F.2d at 1479. In a lengthy dissent, Judge Nelson persuasively argued that the majority opinion effectively eviscerated the public/private distinction by providing blanket protection to all of Marcos' acts during his reign. On rehearing en banc (which occurred after defense counsel's brief was submitted), the Ninth Circuit reversed this aspect of its decision and essentially adopted Judge Nelson's position, holding that Marcos had not established that the alleged thefts were public acts. As the Court stated: "Our courts have had no difficulty distinguishing the legal acts of a deposed ruler from his acts for personal profit that lack a basis in law." *Marcos III*, 862 F.2d at 1361. *Marcos II* is thus of no precedential value on this question.

Yet another consideration counsels against application of the act of state doctrine to this case. Although originally couched in terms of sovereign immunity, the doctrine as presently developed does not rest on principles of international law or respect for sovereign independence. More recent interpretations of the doctrine instead emphasize the separation of powers rationale—more specifically, the need to preclude judicial encroachment in the field of foreign policy and international diplomacy. *See Sabbatino*, 376 U.S. at 421–23, 84 S.Ct. at 936–37; *In re Grand Jury Proceedings Bank of Nova Scotia*, 740 F.2d at 831; *International Ass'n of Machinists & Aerospace Workers v. OPEC*, 649 F.2d 1354, 1358 (9th Cir.1981), *cert. denied*, 454 U.S. 1163, 102 S.Ct. 1036, 71 L.Ed.2d 319 (1982); *Marcos III, supra* ("The doctrine is meant to facilitate the foreign relations of the United States, not to furnish the equivalent of sovereign immunity to a deposed

ruler."). In questioning the validity of acts of foreign states, the judiciary may well hinder the Executive's conduct of foreign affairs and the need to speak with one voice on the world stage. No such danger is present here and in fact the opposite is true since the Executive's position is amply demonstrated by its decision to indict and prosecute the defendant. *See United States v. Evans*, 667 F.Supp. 974, 987 (S.D. N.Y.1987). Of course, the Executive's position, though relevant, is not dispositive. *Marcos I*, 806 F.2d at 358. "Whether to invoke the act of state doctrine is ultimately and always a judicial question." *Allied Bank International v. Banco Credito Agricola de Cartago*, 757 F.2d 516, 521 n. 2 (2d Cir.), *cert. dismissed*, 473 U.S. 934, 106 S.Ct. 30, 87 L.Ed.2d 706 (1985). The Court simply notes that this case does not present the possibility of interference with the Executive branch that might otherwise exist. The Court need not rest on this finding, however, since it concludes that Noriega has not demonstrated that his alleged drug-related activities were in fact acts of state rather than measures to further his own private self-interest. Absent such showing, the act of state doctrine cannot apply.

*C. Diplomatic Immunity*

■ Noriega concedes at the outset that his assertion of diplomatic status does not fit within the confines of either the Diplomatic Relations Act[15] or the Vienna Convention on Diplomatic Relations,[16] the two bodies of law governing diplomatic privileges and immunities. Among other deficiencies, the government of Panama never requested that Noriega be accredited as a diplomat and the United States at no time granted Noriega such status, as required by the Convention, Articles 9 and 10.[17] Nor did Noriega ever meet the Department of State's standards for accreditation, which require, *inter alia*, that the individual reside in the Washington D.C. area and devote official activities to dip-

---

**15.** Pub.L. No. 95–393, 92 Stat. 808 (1978), codified at 22 U.S.C. §§ 254a–e.

**16.** T.I.A.S. No. 7502, 23 U.S.T. 3227, April 18, 1961.

**17.** Affidavit of Richard Gookin, Assistant Chief of Protocol, United States Department of State, attached as Exhibit "D" to *Government's Motion In Opposition to Defendant Noriega's Motion to Dismiss the Indictment* (October 20, 1988).

lomatic functions on an essentially full-time basis.[18] As Defendant himself states, "[d]iplomatic immunity generally deals with eligible persons who are present in the United States."[19] In this case, Noriega was neither eligible nor present in this country as a diplomat.

In light of his failure to satisfy the conventional requirements for diplomatic status, Noriega relies principally on the fact that he traveled on a Panamanian diplomatic passport and was on three occasions granted an "A–2" visa by the United States. In the first place, issuance of the Panamanian diplomatic passport is a matter solely of Panamanian law and has no effect on its holder's status in another state. Though diplomatic passports issued by Panama to reflect the esteem which that nation assigned to Defendant may have obtained Noriega certain courtesies in international travel, they are without significance in international law and United States law and do not, by themselves, entitle Noriega to any internationally or domestically protected status. "Generally, a sending state issues a diplomatic passport to its diplomatic agent and the receiving state gives him a diplomatic visa, but such passports and visas are sometimes issued as a courtesy also to persons other than diplomats, and they do not prove that the holder enjoys diplomatic status or is entitled to diplomatic privileges and immunities in the receiving state." *Restatement (Third)* § 464, Reporters' Note 1 (citing *United States v. Arizti*, 229 F.Supp. 53 (S.D.N.Y.1964), and *United States v. Coplon*, 88 F.Supp. 915 (S.D.N.Y.1950)). Mere issuance of the passport does not constitute the necessary notification and request for accreditation and, assuming arguendo it did, it has no effect in the absence of acceptance as such by the United States. *Restatement (Third)* § 464, Reporters' Note 1 ("A person accredited by the sending state does not become a dip-

lomatic agent for purposes of this section unless the receiving state agrees.").

Nor does the "A–2" visa establish anything of significance in the way of diplomatic immunity. The issuance of United States visas is an administrative action in connection with United States immigration law and is quite independent of the process of diplomatic accreditation. In October 1985, the Department of State reminded all diplomatic missions in the United States by diplomatic note that:

"[U]nder U.S. law, the issuance of visas is a procedure by which immigration to and visits in the United States are administratively controlled. * * * * Under the applicable regulations A-category visas are issued to thousands of persons each year, many of whom never perform diplomatic or consular functions in the United States. * * * * The mere possession of an A-category visa by a person not accredited to the United States in accordance with these procedures [promulgated by the Chief of Protocol] gives such person no claim to diplomatic or consular status in the United States, and thus no entitlement to the privileges and immunities extended to persons in diplomatic or consular status."[20]

In other words, mere possession of an "A–2" visa does not confer diplomatic immunity; other criteria, none of which are satisfied here, must be met. *See United States v. Kostadinov*, 734 F.2d 905, 912 (2d Cir.), *cert. denied*, 469 U.S. 881, 105 S.Ct. 246, 83 L.Ed.2d 184 (1984); *United States v. Arizti*, 229 F.Supp. at 54–55; *United States v. Coplon*, 88 F.Supp. at 920. For example, Defendant has presented no proof that the United States government accepted him as a member of the Panamanian diplomatic mission, supplied him with a diplomatic identity card, or included him on any official diplomatic list. Absent these indicia of diplomatic status, the "A–2" visa

18. United States Department of State memorandum, attached as Exhibit "C" to *Government's Motion in Opposition to Defendant Noriega's Motion to Dismiss the Indictment* (Oct. 20, 1988).

19. *Defendant Noriega's Motion to Dismiss the Indictment*, p. 45 (Sept. 15, 1988).

20. United States Department of State memorandum, attached as Exhibit "E" to *Government's Motion in Opposition to Defendant Noriega's Motion to Dismiss the Indictment* (Oct. 20, 1988).

is plainly inadequate. Defendant's claim to diplomatic immunity must therefore fail.

## III. DEFENDANTS' PRISONER OF WAR STATUS

Defendants Noriega and Del Cid contend that they are prisoners of war ("POW") within the meaning of the Geneva Convention Relative to the Treatment of Prisoners of War, (Geneva III),[21] a status, Defendants maintain, which divests this Court of jurisdiction to proceed with this case. For the purposes of the motion at bar, the Government does not maintain that Defendants are not prisoners of war, but rather argues that even were Defendants POWs, the Geneva Convention would not divest this Court of jurisdiction. Thus, the Court is not presented with the task of determining whether or not Defendants are POWs under Geneva III, but proceeds with the motion at bar as if Defendants were entitled to the full protection afforded by the Convention.[22] Defendants' arguments under the Geneva Convention are grounded in Articles 82, 84, 85, 87, and 99, and 22, each of which is examined, in turn, below.

### x. Article 82

A prisoner of war shall be subject to the laws, regulations and orders in force in the armed forces of the Detaining Power; the Detaining Power shall be justified in taking judicial or disciplinary measures in respect of any offence committed by a prisoner of war against such laws, regulations or orders. However, no proceedings or punishments contrary to the provisions of this Chapter shall be allowed. If any law, regulation or order of the Detaining Power shall declare acts committed by a prisoner of war to be punishable, whereas the same acts would not be punishable if committed by a member of the forces of the Detaining Power, such acts shall entail disciplinary punishments only.

██ As is evident from its face, Article 82 pertains to disciplinary and penal procedures against POWs for offenses committed after becoming POWs, allowing for prosecutions against POWs only for acts which would be prosecutable against a member of the detaining forces. Thus, Article 82 is clearly inapplicable to the instant case because Noriega and Del Cid are being prosecuted not for offenses committed after their capture but for offenses committed well before they became prisoners of war.

### x. Article 84

A prisoner of war shall be tried only by a military court. unless the existing laws of the Detaining Power expressly permit the civil courts to try a member of the armed forces of the Detaining Power in respect to the particular offence alleged to have been committed by the prisoner of war.

In no circumstances whatever shall a prisoner of war be tried by a court of any kind which does not offer the essential guarantees of independence and impartiality as generally recognized and, in particular, the procedure of which does not afford the accused the rights and means of defence provided for in Article 105.

██ Under 18 U.S.C. § 3231, federal district courts have concurrent jurisdiction with military courts over all violations of the laws of the United States committed by military personnel.[23] The indictment

---

**21.** There are in fact four Geneva Conventions of 1949: (1) the Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armies in the Field; (2) the Geneva Convention for the Amelioration of the Condition of Wounded, Sick, and Shipwrecked Members of Armed Forces at Sea; (3) the Geneva Convention Relative to the Treatment of Prisoners of War; and (4) the Geneva Convention Relative to the Protection of Civilian Persons in Time of War.

**22.** The Third Geneva Convention defines a "prisoner of war" as a person who has fallen into the power of the enemy, and is (1) a member of the armed forces of a Party to the conflict; (2) a member of the militia or volunteer corps forming part of such armed forces; or (3) a member of regular armed forces who professes allegiance to a government or authority not recognized by the detaining power. Geneva Convention, Article 4, Section A(1), (2).

**23.** *See United States v. Mariea,* 795 F.2d 1094 (1st Cir.1986); *United States v. Walker,* 552 F.2d 566, 567 (4th Cir.), *cert. denied,* 434 U.S. 848, 98 S.Ct. 157, 54 L.Ed.2d 116 (1977).

charges Defendants with various violations of federal law, including narcotics trafficking, RICO violations, and RICO conspiracy. These are allegations of criminal misconduct for which any member of the United States Armed Forces could be prosecuted. Consequently, the prohibition embodied in Article 84, paragraph 1 does not divest this Court of jurisdiction.

It has not been argued by Defense Counsel that the district court does not offer the essential guarantees of independence and impartiality "as generally recognized ..." Neither do Defendants contend that they will not be afforded the full measure of rights provided for in Article 105. Those rights include representation of counsel and prior notification of charges. See 6 U.S.T. at 3396. Indeed, Defendants will enjoy the benefit of all constitutional guarantees afforded any person accused of a federal crime.

#### x. Article 85

Prisoners of war prosecuted under the laws of the Detaining Power for acts committed prior to capture shall retain, even if convicted, the benefits of the present Convention.

 Rather than supporting Defendants' overall position pressed under the Geneva Convention, this Article appears to recognize the right to prosecute asserted by the Government. The Article refers to "prisoners ... prosecuted under the laws of the Detaining Power" (i.e., the United States) and for acts "committed prior to capture." Further, the benefits of the Convention shall be afforded the POW "even if convicted." The indictment charges the Defendants with violations of the laws of the United States allegedly committed between December 1982 and March 1986—well before the military action and apprehension by surrender.[24]

#### x. Article 87

Prisoners of war may not be sentenced by the military authorities and courts of the Detaining Power to any penalties except those provided for in respect of members of the armed forces of said Power who have committed the same acts ...

 Article 82 reflects the principle of "equivalency" embodied in other Articles of the Convention. That principle provides that, in general, prisoners of war may be prosecuted for criminal violations only if a member of the armed forces of the detaining country would be subject to like prosecution for the same conduct. The specific application of the 'equivalency principle' in Article 87 prevents prisoners of war from being subject to penalties not imposed on the detaining power's soldiers for the same acts. Assuming Defendants are convicted of one or more of the crimes with which they are charged, they face criminal sentences no greater nor less than would apply to an American soldier convicted of the same crime. The instant prosecution is therefore consistent with the provisions of Article 87.

#### x. Article 99

No prisoner of war may be tried or sentenced for an act which is not forbidden by the law of the Detaining Power or by international law, in force at time the said act was committed.

No moral or physical coercion may be exerted on a prisoner of war in order to induce him to admit himself guilty of the act of which he is accused.

No prisoner of war may be convicted without having had an opportunity to present his defence and the assistance of a qualified advocate or counsel.

Article 99 proscribes the prosecution of prisoners of war under *ex post facto* laws, and prohibits coerced confessions. This Article further codifies other fundamental rights secured to any criminal defendant under the Constitution of the United States of America. All accused defendants, "prisoner of war" status notwithstanding, are guaranteed these basic protections.

The Defense has not contended, and of course cannot contend, that the narcotics

---

**24.** Defendant Del Cid was arrested on December 26, 1989. Defendant Noriega was arrested shortly thereafter, on January 3, 1990.

offenses with which Defendants are charged were permitted under U.S. law at the time the acts were allegedly committed. Neither has there been any assertion that Defendants were coerced into admitting guilt or that any effort was made in that direction. Defendants are represented by competent counsel and are being afforded all rights to which they are entitled under the law. Article 99 thus does not operate to divest the Court of jurisdiction.

### x. Article 22

Prisoners of war may be interned only in premises located on land and affording every guarantee of hygiene and healthfulness. Except in particular cases which are justified by the interest of the prisoners themselves, they shall not be interned in penitentiaries.

Prisoners of war interned in unhealthy areas, or where the climate is injurious for them, shall be removed as soon as possible to a more favourable climate. The Detaining Power shall assemble prisoners of war in camps or camp compounds according to their nationality, language and customs, provided that such prisoners shall not be separated from prisoners of war belonging to the armed forces with which they were serving at the time of their capture, except with their consent.

Defendants maintain that Article 22 deprives the Court of personal jurisdiction by requiring that they be returned to Panama and detained along with other Panamanian prisoners of the armed conflict. The Court perceives no such requirement in Article 22, which relates to the general conditions, and not the location, of internment. The provision upon which Defendants rely states that prisoners shall not be interned with persons of different nationality, language, and customs, and "shall not be separated from prisoners of war belonging to the armed forces with which they were serving at the time of their capture." 6 U.S.T. at 3336. According to Defendants' interpretation, Article 22 would require that all prisoners of war from the same armed forces be interned together in a single prisoner of war facility. Yet this clearly cannot be Article 22's intent, since internment under those conditions would

likely violate its overall concern for healthy and comfortable conditions of internment. Indeed, Defendant Noriega undercuts his own argument by suggesting that he be detained in an agreeable third country, an action which would certainly separate him from members of Panama's armed forces being detained in Panama. The more obvious interpretation of the provision that it prevents prisoners belonging to the armed forces of one nation from being forcibly interned with prisoners from the armed forces of another nation. Such is not the case here.

Moreover, nothing in Article 22 or elsewhere prohibits the detaining power from temporarily transferring a prisoner to a facility other than an internment camp in connection with legal proceedings. Because the Convention contemplates that prisoners of war may be prosecuted in civilian courts, it necessarily permits them to be transferred to a location that is consistent with the orderly conduct of those proceedings. It is inconceivable that the Convention would permit criminal prosecutions of prisoners of war and yet require that they be confined to internment camps thousands of miles from the courthouse and, quite possibly, defense counsel.

The remaining provisions of the Convention cited by Defendant Noriega lend little, if any, support to his argument regarding jurisdiction. Article 12 of the Convention, which Noriega contends mandates his removal to a third country, in fact limits the ability of the United States to effect such a transfer:

Prisoners of war may only be transferred by the Detaining Power to a Power which is a party to the Convention and after the Detaining Power has satisfied itself of the willingness and ability of such transferee Power to apply the Convention. When prisoners of war are transferred under such circumstances, responsibility for the application of the Convention rests on the Power accepting them while they are in custody.

6 U.S.T. at 3328.

Finally, Noriega cites Article 118 of the Convention, which requires prisoners

of war to be released and repatriated "without delay after the cessation of active hostilities." 6 U.S.T. at 3406. That provision is, however, limited by Article 119, which provides that prisoners of war "against whom criminal proceedings for an indictable offense are pending may be detained until the end of such proceedings, and, if necessary, until the completion of the punishment." 6 U.S.T. at 3408. Since criminal proceedings are pending against Noriega, Article 119 permits his detainment in the United States notwithstanding the cessation of hostilities.

### x. Extradition Treaty Between Panama and the United States

Defendants argue that Geneva III operates to divest this Court of jurisdiction over Defendants because they could not have been extradited from Panama to the United States for the crimes with which they are charged. The genesis of Defendants argument is not in the language of the Convention, but rather is found in the Red Cross Commentary on Geneva III (the "Commentary") which, in discussing Article 85, states that:

> [I]n general, acts not connected with the state of war may give rise to penal proceedings only if they are punishable under the laws of both the Detaining Power and the Power of origin. As a parallel, reference may be had to extradition agreements or to the customary rules concerning extradition. An act in respect of which there could be no extradition should not be punished by the Detaining Power. One may also examine whether prosecution would have been possible in the country of origin. If the answer is in the negative, the prisoner of war should not be tried by the Detaining Power.

III International Committee of the Red Cross, *Commentary on the Geneva Convention Relative to the Treatment of Prisoners of War*, 419, J. Pictet (Ed.1960).

■■■ First, it must be underscored that the Red Cross Commentary is merely a discussion suggesting what the author believes should or should not be done as a matter of policy; the Commentary is not part of the treaty. Nowhere does the text of Geneva III purport to limit the jurisdiction of domestic courts to extraditable offenses. Defendants would infer this limitation from Commentary on the Geneva Convention. The Supreme Court has, however, held that in order for an international treaty to divest domestic courts of jurisdiction, the treaty must expressly provide for such limitation:

> If [the defendant] committed an offense against the United States and its liquor importation laws, [he] cannot escape conviction, unless the treaty affirmatively confers on [him] immunity from prosecution. There certainly are no express words granting such immunity. Why should it be implied? If it was intended by the parties why should it not have been expressed?

*Ford v. United States*, 273 U.S. 593, 611, 47 S.Ct. 531, 537, 71 L.Ed. 793 (1927); *See also United States v. Postal*, 589 F.2d at 875–876 n. 19.

Moreover, the Commentary itself does not support Defendants' position. The Commentary suggests that extradition treaties in existence may serve as a guiding "reference" in determining what *acts* should be punishable by the Detaining Party. Defendants entire argument is premised on the observation that the *act* of narcotics trafficking is not one of the thirteen crimes listed in the extradition treaty between Panama and the United States. Defendants overlook, however, the fact that the narcotics offenses with which Defendants are charged not only constitute the kinds of offenses which could be the subject of extradition under customary international law, but are specifically contemplated by subsequent treaties between the United States and Panama. Under Article 36 of the Single Convention on Narcotic Drugs, Mar. 30, 1961, 18 U.S.T. 1407 T.I. A.S. No. 6298, as amended by the Protocol Amending the Single Convention on Narcotic Drugs, Mar. 25, 1972, 26 U.S.T. 1441, T.I.A.S. No. 8118, offenses relating to the production, possession and distribution of narcotics are "deemed to be included as an extraditable offence in any extradition treaty between the Parties." 26 U.S.T. at 1451–1452. Furthermore, in the event an

offender is not extradited, Article 36 of the Single Convention on Narcotics Drugs specifically provides that the offender "shall be prosecuted by the Party in whose territory the offence was committed." *Id.* at 1452. Thus, the Single Convention amends the Extradition Treaty of 1904 between the United States and Panama to include narcotics offenses, and also makes clear that such offenses constitute prosecutable crimes in both Panama and the United States.

As is evident from its text and construed as a whole, the essential purpose of the Geneva Convention Relative to the Treatment of Prisoners of War is to protect prisoners of war from prosecution for conduct which is customary in armed conflict. The Geneva Convention was never intended, and should not be construed, to provide immunity against prosecution for common crimes committed against the detaining power before the outbreak of military hostilities. It therefore has no application to the prosecution of Defendants for alleged violations of this country's narcotics laws. Indeed, the Court has not been presented with any provision of the Convention which suggests or directs that this proceeding is one which, in deference to the Convention, should be terminated.

The humanitarian character of the Geneva Convention cannot be overemphasized, and weighs heavily against Defendants' applications to the Court. The Third Geneva Convention was enacted for the express purpose of protecting prisoners of war from abuse after capture by a detaining power. The essential principle of *tendance liberale,* pervasive throughout the Convention, promotes lenient treatment of prisoners of war on the basis that, not being a national of the detaining power, they are not bound to it by any duty of allegiance. Hence, the "honorable motives" which may have prompted his offending act must be recognized.[25] That such motives are consistent with the conduct and laws of war is implicit in the principle. Here, the Government seeks to prosecute Defendants for alleged narcotics trafficking and other drug-related offenses—activities which have no bearing on the conduct of battle or the defense of country. The fact that such alleged conduct is by nature wholly devoid of "honorable motives" renders *tendance liberale* inapposite to the case at bar.

## IV. ILLEGAL ARREST

Noriega also moves to dismiss the indictment on the ground that the manner in which he was brought before this Court— as a result of the United States government's invasion of Panama—is "shocking to the conscience and in violation of the laws and norms of humanity." He argues that the Court should therefore divest itself of jurisdiction over his person. In support of this claim, Noriega alleges that the invasion of Panama violated the Due Process Clause of the Fifth Amendment of the United States Constitution, as well as international law. Alternatively, he argues that even in the absence of constitutional or treaty violations, this Court should nevertheless exercise its supervisory authority and dismiss the indictment so as to prevent the Court from becoming a party to the government's alleged misconduct in bringing Noriega to trial.

### A. The Fifth Amendment Due Process Argument

It is well settled that the manner by which a defendant is brought before the court normally does not affect the ability of the government to try him. The Ker–Frisbie doctrine, as this rule has come to be known, provides that a court is not deprived of jurisdiction to try a defendant on the ground that the defendant's presence before the court was procured by unlawful means. *Ker v. Illinois,* 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886); *Frisbie v. Collins,* 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952). This Circuit's adherence to the Ker–Frisbie doctrine was firmly established in *United States v. Winter,* in which the former Fifth Circuit declared:

[W]e are convinced that under well established case law of the Supreme Court and this Circuit, a defendant in a criminal

**25.** See International Committee of the Red Cross, *Commentary to the Third Geneva Convention Relative to the Treatment of Prisoners of War,* J. Pictet (Ed.1960) on Articles 83 and 87.

trial whether citizen or alien, whether arrested within or beyond the territory of the United States, may not successfully challenge the District Court's jurisdiction over his person on the grounds that his presence was unlawfully secured.

509 F.2d at 985–86. *See also United States v. Rosenthal*, 793 F.2d 1214, 1231 (11th Cir.1986), *cert. denied*, 480 U.S. 919, 107 S.Ct. 1377, 94 L.Ed.2d 692 (1987); *United States v. Postal*, 589 F.2d at 873 ("A defendant may not ordinarily assert the illegality of his obtention to defeat the court's jurisdiction over him."). Thus, in order to divest the Court of jurisdiction, it is not enough for the defendant to assert, without more, that his arrest was illegal.

■ Noriega does not challenge the validity of the Ker–Frisbie rule but instead relies on what is commonly referred to as the Toscanino exception carved out by the Second Circuit. *United States v. Toscanino*, 500 F.2d 267 (2d Cir.1974). In that case, which also involved a challenge to a court's exercise of personal jurisdiction, the defendant contended that his presence was illegally obtained through torture and abuse. In support of his claim, the defendant offered to prove that United States officials abducted him from Uruguay and subjected him to extensive and continuous torture, including pinching his fingers with metal pliers, flushing alcohol into his eyes and nose, forcing other fluids up his anal passage, and attaching electrodes to his extremities and genitals. *Id.* at 270. Confronted with these allegations, the court refused to permit the government the fruits of its misconduct, holding that "we view due process as now requiring a court to divest itself of jurisdiction over the person of a defendant where it has been acquired as the result of the government's deliberate, unnecessary and unreasonable invasion of the accused's constitutional rights." *Id.* at 275. In so holding, the court relied on the Supreme Court's decision in *Rochin v. California*, where the Due Process Clause was applied to "the whole course of the proceedings in order to ascertain whether they offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the

most heinous offenses." 342 U.S. 165, 172–73, 72 S.Ct. 205, 209–10, 96 L.Ed. 183 (1952).

The type of governmental conduct necessary to invoke the Toscanino exception and warrant the drastic remedy of dismissal was subsequently clarified and narrowed by the Second Circuit in *United States ex rel. Lujan v. Gengler*, 510 F.2d 62 (2d Cir.), *cert. denied*, 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975) [hereinafter *Lujan v. Gengler* ]. There, the Court held that due process is violated and dismissal warranted only where the defendant proves "torture, brutality, and similar outrageous conduct." *Id.* at 65. The conduct must "shock the conscience." *Id.* Noriega asserts that the deaths, casualties, and destruction of property caused by the United States military action in Panama is "shocking to the conscience" and therefore falls within the Toscanino exception as narrowed by *Lujan v. Gengler*.

Before addressing the substance of Noriega's claim, the Court is faced with the threshold issue of Toscanino's continued vitality in light of subsequent Supreme Court and Eleventh Circuit decisions. The Government argues that Toscanino has been undermined by the Supreme Court, citing in particular the Court's holdings in *INS v. Lopez–Mendoza*, 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984), and *United States v. Crews*, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980). In *Lopez–Mendoza*, the INS arrested the defendant, an illegal alien, after searching his place of employment without a search or arrest warrant and without the consent of the defendant's employer. In reversing the lower court's ruling vacating the defendant's deportation order, the Court held that "the 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred." 468 U.S. at 1039, 104 S.Ct. at 3483–84. Similarly, in *Crews*, the Court ruled that the defendant could not claim immunity from prosecution simply because his appearance in court was precipitated by an illegal arrest, stating: "Respondent himself is not a suppressible

'fruit,' and the illegality of his detention cannot deprive the Government of the opportunity to prove his guilt through the introduction of evidence wholly untainted by police misconduct." 445 U.S. at 474, 100 S.Ct. at 1252.[26] In that case, the defendant objected to an in-court identification as the product of an arrest without probable cause.

These cases are distinguishable from Toscanino and therefore do not prove the Government's point; neither involved the type of inhumane governmental conduct "shocking to the conscience" to which Toscanino was addressed and, as such, merely reaffirmed the general Ker–Frisbie rule that an illegal arrest, *without more*, does not bar prosecution. As Toscanino establishes, there is a difference between conduct which is merely illegal and conduct so egregious it shocks the conscience.

The Government next argues that, even if good law, Toscanino has nonetheless been rejected by this Circuit. In *United States v. Rosenthal*, 793 F.2d at 1232, the Eleventh Circuit Court of Appeals stated that "[t]his court has declined to adopt the Toscanino approach," citing its previous decision in *United States v. Darby*, 744 F.2d 1508 (11th Cir.1984), *cert. denied*, 471 U.S. 1100, 105 S.Ct. 2322, 85 L.Ed.2d 841 (1985). The court in *Darby*, however, rejected only a broad reading of Toscanino, stating explicitly that it "has not ruled out the possibility of a narrow exception to the Ker–Frisbie doctrine for extreme cases ..." *Id.* at 1531. The defendant in *Darby* claimed that he was forcibly abducted from Honduras and brought to stand trial in the United States, but did not allege the sort of "shocking governmental conduct sufficient

to convert an abduction which is simply illegal into one that sinks to a violation of due process." *Id.* n. 20 (quoting *Lujan v. Gengler*, 510 F.2d at 66). Thus, the court held, relief would not be warranted *"if we were to follow the Second Circuit."* *Id.* at 1531. (emphasis added). Moreover, *Rosenthal* itself did not squarely face the issue since the conduct complained of did not involve the type of brutal treatment allegedly suffered by Toscanino. 793 F.2d at 1232. Following the Eleventh Circuit's decision in *Darby*, this Court likewise declines to rule out the possibility of a Toscanino exception in circumstances of extreme and outrageous government conduct. *But see Matta–Ballesteros v. Henman*, 896 F.2d 255, 263 (7th Cir.1990). As Justice Rehnquist has stated, there may be situations "in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial process to obtain a conviction." *United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973). The case at bar, however, does not present such a situation, since Noriega does not, and presumably cannot, allege that the Government's invasion of Panama violated any right personal to him, as required by the Due Process Clause of the Fifth Amendment. The defendant does not claim that he was personally mistreated in any manner incident to his arrest, at least not in any manner nearly approaching the egregious physical abuse stated in Toscanino.[27] Rather, Noriega bases his due process claim on the rights of third parties, to wit, those Panamanian citizens who were killed, injured, or had their property de-

---

26. *Cf. United States v. Blue*, 384 U.S. 251, 255, 86 S.Ct. 1416, 1419, 16 L.Ed.2d 510 (1966) ("Our numerous precedents ordering the exclusion of illegally obtained evidence assumed implicitly that the remedy does not extend to barring the prosecution altogether. So drastic a step might marginally advance some of the ends served by the exclusionary rules, but it would also increase to an intolerable degree interference with the public interest in having the guilty brought to book."); *Gerstein v. Pugh*, 420 U.S. 103, 119, 95 S.Ct. 854, 865, 43 L.Ed.2d 54 (1975) ("Nor do we retreat from the established rule that illegal arrest or detention does not void a subsequent conviction.").

27. On the present record, the only incident which comes close to any kind of personal mistreatment is the above-mentioned event in which American troops blasted the Papal Nunciature in Panama City with loud rock-and-roll music in an apparent effort to drive Noriega out. While there are those who might consider continued exposure to such music an Eighth Amendment violation, it is the opinion of the Court that such action does not rise to the level of egregious misconduct sufficient to constitute a due process violation.

stroyed as a consequence of the invasion.[28] The applicable cases suggest, however, that the limitations of the Due Process Clause "come into play only when the Government activity in question violated some protected right of the *defendant.*" *United States v. Payner,* 447 U.S. 727, 737 n. 9, 100 S.Ct. 2439, 2447 n. 9, 65 L.Ed.2d 468 (1980) (emphasis in original) (citing *Hampton v. United States,* 425 U.S. 484, 490, 96 S.Ct. 1646, 1650, 48 L.Ed.2d 113 (1976) (plurality opinion)). Nothing in Toscanino or in the other decisions cited by Noriega undermines that principle or in any way suggests that the due process rights of third parties may be vicariously asserted, as those cases all involve physical violation of the defendant's person. *See, e.g., Rochin v. California, supra* (forcible removal of evidence from defendant's stomach by government agents held to violate due process); *United States v. Toscanino, supra* (allegations of severe physical torture of a defendant by government agents sufficient to state a due process claim); *United States v. Fernandez–Caro,* 677 F.Supp. 893 (S.D.Tex.1987) (same).

■ Moreover, while the Supreme Court has under certain limited circumstances allowed one party standing to assert another party's rights, *see, e.g., Secretary of State of Maryland v. Joseph H. Munson Co.,* 467 U.S. 947, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984); *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Barrows v. Jackson,* 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953), the doctrine of 'third-party' or 'jus tertii' standing addresses only the question

of the identity of the party who may raise a legal claim; it does not give rise to an expansion of the right or remedy in question if the claim is sustained. Here, Noriega is not merely invoking the due process rights of third parties, but further urges that the indictment against him be dismissed as a result of alleged violations of those rights. However, none of the Panamanian victims whose rights, if any, Noriega asserts are being indicted or subjected to jurisdiction in this Court; in this context, the only party interested in having the indictment against Noriega dismissed is Noriega. Thus, Noriega does not just seek to provide a vehicle through which the rights of others can be adjudicated; instead, he is attempting to extend the substantive reach of the Due Process Clause and the 'third-party' standing doctrine to encompass an expansion, as opposed to a mere assertion, of third-party rights and remedies. Nothing in the 'third-party' standing cases upon which Noriega relies provide support for that ambitious undertaking. To the extent, then, that Toscanino requires a court to divest itself of jurisdiction over a person whose due process rights have been violated, it is of no aid to the defendant in this case.

### B. Violations of International Law

■ In addition to his due process claim, Noriega asserts that the invasion of Panama violated international treaties and principles of customary international law—specifically, Article 2(4) of the United Nations Charter,[29] Article 20[17] of the Organization of American States Charter,[30] Arti-

---

**28.** The Court assumes without deciding that, consistent with Toscanino, the Fifth Amendment's guarantee of due process extends to aliens abroad. In *United States v. Verdugo–Urquidez,* —— U.S. ——, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990), the Supreme Court held that the Fourth Amendment does not apply to searches and seizures abroad if the target of the search and seizure is an alien with "no voluntary attachment to this country." —— U.S. at ——, 110 S.Ct. at 1064. Although the Court indicated that aliens outside the territorial bounds of the United States do not enjoy due process protection, *Id.* at ——, 110 S.Ct. at 1062 (citing *Johnson v. Eisentrager,* 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950)), the question of the Fifth Amendment's extraterritorial application was not at

issue in that case. *Id.* —— U.S. at ——, 110 S.Ct. at 1060.

**29.** Article 2(4) of the United Nations Charter provides, in relevant part, that "All Members shall refrain in their international relations from the threat or use of force against the territorial integrity or political independence of any state, or in any other manner inconsistent with the Purposes of the United Nations." 59 Stat. 1031, 1037, T.S. 993.

**30.** Article 20[17] of the O.A.S. Charter provides that "[t]he territory of a State is inviolable; it may not be the object, even temporarily, of military occupation or of other measures of force taken by another State, directly or indi-

cles 23(b) and 25 of the Hague Convention,[31] Article 3 of Geneva Convention I, and Article 6 of the Nuremberg Charter.[32]

Initially, it is important to note that individuals lack standing to assert violations of international treaties in the absence of a protest from the offended government. Moreover, the Ker–Frisbie doctrine establishes that violations of international law alone do not deprive a court of jurisdiction over a defendant in the absence of specific treaty language to that effect. *United States v. Postal*, 589 F.2d at 875–76 n. 19; *Cook v. United States*, 288 U.S. 102, 53 S.Ct. 305, 77 L.Ed. 641 (1933); *Ford v. United States*, 273 U.S. at 611, 47 S.Ct. at 537. To defeat the Court's personal jurisdiction, Noriega must therefore establish that the treaty in question is self-executing in the sense that it confers individual rights upon citizens of the signatory nations, and that it by its terms expresses "a self-imposed limitation on the jurisdiction of the United States and hence on its courts." *United States v. Postal, supra.*

■ As a general principle of international law, individuals have no standing to challenge violations of international treaties in the absence of a protest by the sovereign involved. *United States v. Hensel*, 699 F.2d 18, 30 (1st Cir.), *cert. denied*, 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1317 (1983); *Matta–Ballesteros v. Henman*, 896 F.2d at 263; *United States v. Williams*, 617 F.2d 1063, 1090 (5th Cir. 1980) (en banc) ("[R]ights under international common law must belong to the sovereigns, not to individuals"); *United States v. Rosenthal*, 793 F.2d at 1232 ("Under international law, it is the contracting foreign government that has the right to complain about a violation."). The rationale

behind this rule is that treaties are "designed to protect the sovereign interests of nations, and it is up to the offended nations to determine whether a violation of sovereign interests occurred and requires redress." *United States v. Zabaneh*, 837 F.2d 1249, 1261 (5th Cir.1988). *See also United States v. Cadena*, 585 F.2d at 1261; *United States v. Davis*, 767 F.2d 1025, 1030 (2d Cir.1985); *United States v. Cordero*, 668 F.2d 32, 37–38 (1st Cir.1981); *United States v. Valot*, 625 F.2d 308, 310 (9th Cir.1980); *Lujan v. Gengler*, 510 F.2d at 67 (under international law, "individual rights are only derivative through the states") (quoting *Restatement (Second) of the Foreign Relations Law of the United States*, § 115, comment e (1965)). Consistent with that principle, a treaty will be construed as creating enforceable private rights only if it expressly or impliedly provides a private right of action. *Head Money Cases*, 112 U.S. 580, 598–99, 5 S.Ct. 247, 253–54, 28 L.Ed. 798 (1884).

■ No such rights are created in the sections of the U.N. Charter, O.A.S. Charter, and Hague Convention cited by Noriega. Rather, those provisions set forth broad general principles governing the conduct of nations toward each other and do not by their terms speak to individual or private rights. *See Frolova v. Union of Soviet Socialist Republics*, 761 F.2d at 374 (articles phrased in "broad generalities" constitute "declarations of principles, not a code of legal rights"); *Tel–Oren v. Libyan Arab Republic*, 726 F.2d 774, 809 (D.C.Cir. 1984) (Bork, J., concurring) (Articles 1 and 2 of the United Nations Charter "contain general 'purposes and principles,' some of which state mere aspirations and none of which can be sensibly thought to have been

---

rectly, on any grounds whatever. No territorial acquisitions or special advantages obtained either by force or by other means of coercion shall be recognized." 2 U.S.T. 2394, 2420.

**31.** Article 23(b) states that "it is especially forbidden ... [t]o kill or wound treacherously individuals belonging to the hostile nation or army;" Article 25 provides that "[t]he attack or bombardment, by whatever means, of towns, villages, dwellings, or buildings which are undefended is prohibited." 36 Stat. 2277, 2301–02 (1907).

**32.** Noriega also asserts that the United States military action in Panama violated the Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of International Armed Conflicts (Protocol I), U.N.Doc. a/32/144 Annex I (1977). The United States Congress, however, has expressly declined to ratify that Protocol on the grounds that it is "fundamentally unfair and irreconcilably flawed" and "would undermine humanitarian law and endanger civilians in war." S. Treaty Doc. 2, 100th Cong., 1st Sess. iii–iv (1987).

intended to be judicially enforceable at the behest of individuals."), *cert. denied,* 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985); *Lujan v. Gengler,* 510 F.2d at 66–67 (individual may not invoke Article 2(4) of the U.N. Charter or Article 20[17] of the O.A.S. Charter if the sovereign state involved does not protest);[33] *Handel v. Artukovic,* 601 F.Supp. 1421, 1425 (C.D.Cal. 1985) (Hague Convention confers no private right of action on individuals); *Dreyfus v. Von Finck,* 534 F.2d 24, 30 (2d Cir.) (same), *cert. denied,* 429 U.S. 835, 97 S.Ct. 102, 50 L.Ed.2d 101 (1976); *Tel–Oren v. Libyan Arab Republic, supra* at 810 (same). Thus, under the applicable international law, Noriega lacks standing to challenge violations of these treaties in the absence of a protest by the Panamanian government that the invasion of Panama and subsequent arrest of Noriega violated that country's territorial sovereignty.

It can perhaps be argued that reliance on the above body of law, under the unusual circumstances of this case, is a form of legal bootstrapping. Noriega, it can be asserted, is the government of Panama or at least its de facto head of state, and as such he is the appropriate person to protest alleged treaty violations; to permit removal of him and his associates from power and reject his complaint because a new and friendly government is installed, he can further urge, turns the doctrine of sovereign standing on its head. This argument is not without force, yet there are more persuasive answers in response. First, as stated earlier, the United States has consistently refused to recognize the Noriega regime as Panama's legitimate government, a fact which considerably undermines Noriega's position. Second, Noriega

nullified the results of the Panamanian presidential election held shortly before the alleged treaty violations occurred. The suggestion that his removal from power somehow robs the true government of the opportunity to object under the applicable treaties is therefore weak indeed. Finally, there is no provision or suggestion in the treaties cited which would permit the Court to ignore the absence of complaint or demand from the present duly constituted government of Panama. The current government of the Republic of Panama led by Guillermo Endara is therefore the appropriate entity to object to treaty violations. In light of Noriega's lack of standing to object, this Court therefore does not reach the question of whether these treaties were violated by the United States military action in Panama.

Article 3 of Geneva Convention I, which provides for the humane treatment of civilians and other non-participants of war, applies to armed conflicts "not of an international character," i.e., internal or civil wars of a purely domestic nature. 6 U.S.T. at 3116. *See American Baptist Churches v. Meese,* 712 F.Supp. 756, 769 (N.D.Cal.1989); L. Oppenheim, *International Law,* Vol. II at 370 (7th ed. 1952). Accordingly, Article 3 does not apply to the United States' military invasion of Panama.

Finally, Defendant cites Article 6 of the Nuremberg Charter, which proscribes war crimes, crimes against peace, and crimes against humanity. The Nuremberg Charter sets forth the procedures by which the Nuremberg Tribunal, established by the Allied powers after the Second World War, conducted the trials and punishment of major war criminals of the European Axis.

---

**33.** The conclusion that Article 2(4) of the U.N. Charter is not self-executing is supported by the decisions of other courts reaching the same conclusion with respect to various other provisions of the U.N. Charter. *See, e.g., Committee of U.S. Citizens Living in Nicaragua v. Reagan,* 859 F.2d 929, 937–38 (D.C.Cir.1988) (Article 94 of U.N. not self-executing); *Frolova v. Union of Soviet Socialist Republics,* 761 F.2d at 374–75 (Articles 55 and 56 of U.N. Charter not self-executing); *Camacho v. Rogers,* 199 F.Supp. 155, 158 (S.D.N.Y.1961) (Article 55 of U.N. Charter not self-executing). *See also Spiess v. C. Itoh & Co. (America) Inc.,* 643 F.2d 353, 363 (5th Cir.1981) ("[T]he

Charter of the United Nations, although adopted by the United States, is not a self-executing international obligation"); *People of Saipan v. United States Dept. of Interior,* 502 F.2d 90, 100 (9th Cir.1974) (Trask, J., concurring) ("[T]he Charter of the United Nations is not self-executing and does not in and of itself create rights which are justiciable between individual litigants"), *cert. denied,* 420 U.S. 1003, 95 S.Ct. 1445, 43 L.Ed.2d 761 (1975); *Pauling v. McElroy,* 164 F.Supp. 390, 393 (D.D.C.1958) (provisions of U.N. Charter not self-executing), *aff'd,* 278 F.2d 252 (D.C.Cir.), *cert. denied,* 364 U.S. 835, 81 S.Ct. 61, 5 L.Ed.2d 60 (1960).

The Government maintains that the principles laid down at Nuremberg were developed solely for the prosecution of World War II war criminals, and have no application to the conduct of U.S. military forces in Panama. The Court cannot agree. As Justice Robert H. Jackson, the United States Chief of Counsel at Nuremberg, stated: "If certain acts in violation of treaties are crimes, they are crimes whether the United States does them or whether Germany does them, and we are not prepared to lay down a rule of criminal conduct against others which we would not be willing to have invoked against us."[34] Nonetheless, Defendant fails to establish how the Nuremberg Charter or its possible violation, assuming any, has any application to the instant prosecution. As stated above, the Ker–Frisbie doctrine makes clear that violations of treaties or customary international law alone do not deprive the court of jurisdiction over the defendant in the absence of limiting language to that effect. *See United States v. Winter*, 509 F.2d at 989. Defendant has not cited any language in the Nuremberg Charter, nor in any of the above treaties, which limits the authority of the United States to arrest foreign nationals or to assume jurisdiction over their crimes. The reason is apparent; the Nuremberg Charter, as is the case with the other treaties, is addressed to the conduct of war and international aggression. It has no effect on the ability of sovereign states to enforce their laws, and thus has no application to the prosecution of Defendant for alleged narcotics violations. "The violation of international law, if any, may be redressed by other remedies, and does not depend upon the granting of what amounts to an effective immunity from criminal prosecution to safeguard individuals against police or armed forces misconduct." *United States v. Cadena*, 585 F.2d at 1261. The Court therefore refrains from reaching the merits of Defendant's claim under the Nuremberg Charter.

**34.** International Conference on Military Trials, London, 1945, Dept. of State Pub. No. 3080

### C. Supervisory Authority

Having determined that Defendant Noriega fails to state a valid defense based on due process and international law principles, this Court's inquiry is nonetheless unfinished, as Defendant Noriega alternatively bases his motion on the inherent supervisory power of the Court. Noriega alleges that, by asserting jurisdiction over him, this Court would thereby sanction and become party to the Government's alleged misconduct in invading Panama and bringing Noriega to trial.

The supervisory power doctrine, while it may serve to vindicate a defendant's rights in an individual case, "is designed and invoked primarily to preserve the integrity of the judicial system" and "to prevent the federal courts from becoming accomplices" to government misconduct. *United States v. Omni International Corp.*, 634 F.Supp. 1414, 1438 (D.Md.1986) (quoting *United States v. Payner*, 447 U.S. at 744, 100 S.Ct. at 2451 (Marshall, J., dissenting)). Courts have consequently invoked the doctrine to suppress evidence and dismiss indictments in the face of severe or pervasive prosecutorial abuse. *See Omni International Corp., supra*, and cases cited therein. Thus, supervisory authority is in essence a judicial vehicle to deter conduct and correct injustices which are neither constitutional nor statutory violations, but which the court nonetheless finds repugnant to fairness and justice and is loathe to tolerate. *United States v. Leslie*, 783 F.2d 541, 569 (5th Cir.1986) (Williams, Circuit Judge, dissenting) (citing *United States v. Hasting*, 461 U.S. 499, 505, 103 S.Ct. 1974, 1978, 76 L.Ed.2d 96 (1983), and *McNabb v. United States*, 318 U.S. 332, 340, 63 S.Ct. 608, 613, 87 L.Ed. 819 (1943)), *vacated*, 479 U.S. 1074, 107 S.Ct. 1267, 94 L.Ed.2d 128 (1987). As invocation of supervisory power to dismiss an indictment is a harsh remedy, it is reserved only for flagrant or repeated abuses which are outrageous or shock the conscience. *Omni International Corp., supra; United States v. Baskes*, 433

(1949), p. 330.

F.Supp. 799, 806 (N.D.Ill.1977) (quoting *Rochin v. California*, 342 U.S. at 172, 72 S.Ct. at 209). It is certainly not to be applied as a remedy for mere technical illegalities or inadvertent violations, as "[t]hese powers should not permit the criminal to go free because the constable blundered." *Baskes, supra* (citing *People v. Defore*, 242 N.Y. 13, 150 N.E. 585, 587 (1926)). Thus, a higher threshold of government misconduct is imposed for invocation of the supervisory power than that required to state a constitutional or statutory violation. Noriega argues that his arrest and presence before the Court was secured as a result of deliberate and indiscriminate atrocities committed by the United States in the course of its invasion of Panama, and that such conduct "shocking to the conscience" calls for an exercise of the Court's inherent supervisory authority resulting in dismissal of the indictment.

In response, the Government argues that, even pursuant to the Court's inherent supervisory authority, Noriega may not seek dismissal of the indictment based on alleged violations of the rights of third parties—in this case, the rights of individual Panamanians or of the Panamanian state. The Government's position thus seems to be that a defendant's own constitutional or statutory rights must be violated in order to trigger the exercise of a court's supervisory power. This stance blurs the critical distinction between the use of supervisory authority on the one hand and the courts' rulings based on violations of constitutional and statutory law on the other. Since, as stated earlier, use of supervisory authority presents an independent body of law and does not depend on the existence of a constitutional or statutory violation, the fact that a defendant's own such rights have not been violated is not decisive. (*See United States v. Leslie*, 783 F.2d at 569–71, for extensive discussion of the relation of the supervisory powers doctrine to constitutional and statutory law). A contrary result would indeed render the doctrine meaningless, since dismissal of an indictment or other remedy would thus flow from the required constitutional or statutory violation and invocation of the

supervisory authority would therefore be unnecessary. Contrary to the suggestion implicit in the Government's position, "supervisory powers cases ... are not constitutional cases in disguise." *United States v. Payner*, 447 U.S. at 749, 100 S.Ct. at 2453 (Marshall, J., dissenting).

The majority ruling in *Payner, supra,* cited by the Government, is distinguishable on its facts and thus does not constrict this Court's exercise of its supervisory authority in the instant case. In *Payner*, the Supreme Court held that the supervisory power doctrine could not be used to suppress evidence obtained in violation of a third party's Fourth Amendment rights. Because evidence is excluded under the Fourth Amendment only where an unlawful search or seizure violates the defendant's own constitutional rights, the Court refused to allow a different result under the supervisory power doctrine as that approach would circumvent "the careful balance of interests embodied in the Fourth Amendment decisions of this Court." 447 U.S. at 733, 100 S.Ct. at 2445. The Court's concern was simply to prevent supervisory powers from being used as an 'end run' around settled Fourth Amendment law, but its decision explicitly did not "limit the traditional scope of the supervisory power in any way; nor ... render that power 'superfluous.'" 447 U.S. at 735, n. 8, 100 S.Ct. at 2446, n. 8. Since the illegal search at issue in *Payner* did not rise to the level of pervasive or shocking misconduct imposed under the doctrine of supervisory authority, the Court's narrow holding can hardly be construed to render that doctrine meaningless and the judicial system helpless in the face of inhumane conduct shocking to the conscience merely because technical standing requirements are not met. If, for example, we were confronted with a pure law enforcement effort in which government agents deliberately killed and tortured individuals for the sole purpose of discovering a fugitive's whereabouts in order to secure his arrest, the Court would face a situation which properly calls for invocation of its supervisory powers.[35] It would also call to mind Justice Brandeis' eloquent dissent in *Olmstead v. United*

**35.** *See, e.g., United States v. Archer,* 486 F.2d 670, 676–77 (2d Cir.1973).

*States,* 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928):

> Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if its fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face.

This Court may someday have occasion to apply Justice Brandeis' wise words, but this is not that day, for we are confronted not with the above hypothetical but rather a military war in which innocent lives were unfortunately lost in the pursuit of foreign policy objectives. Although the motives behind the military action are open to speculation, the stated goals of the invasion were to protect American lives, support democracy, preserve the Panama Canal Treaties, and bring Noriega to the United States to stand trial for narcotics offenses.[36] Because the President ordered Noriega arrested "in the course of carrying out the military operations in Panama," [37]

the capture of Noriega was incident to the broader conduct of foreign policy. While the Government's asserted rationales for the invasion are not beyond challenge and need not be blindly accepted by this Court, counsel for Noriega have offered no evidence to the contrary and the evidence they have offered in fact bolsters the conclusion that the invasion was primarily an exercise in foreign policy. A report by the "Independent Commission of Inquiry on the U.S. Invasion of Panama," which is attached as an exhibit to Defendant's brief, alleges that the invasion was carried out primarily to promote U.S. economic interests in Panama and to "maintain the Southern Command's use of Panama as a forward base of military operation throughout the region." [38] Indeed, the Commission specifically rejected the arrest of Noriega on drug trafficking charges as a reason for the invasion, stating, "[t]he U.S. attempted to justify its brutal invasion by charging Gen. Noriega with drug laundering operations. The Commission outrightly rejects that as a legitimate justification or the reason for the invasion." [39] The Court cites the Commission's findings not as affirmative proof of the invasion's objectives—the report was not received into evidence—but simply to underscore the fact that no evidence has been presented which suggests that military troops were sent into Panama for the singular or even primary purpose of enforcing U.S. narcotics laws by bringing a suspected drug dealer to trial. The additional fact of Noriega's declaration of war against the United States shortly before the invasion only further undermines that premise.[40]

---

**36.** *Government's Memorandum of Law in Response to Defendant Del Cid's Motion to Dismiss Indictment and Defendant Noriega's Challenge to the Court's Jurisdiction,* pp. 2–3 (Feb. 2, 1990).

**37.** Memorandum for the Secretary of Defense from the President of the United States (Dec. 20, 1989) cited in *Government's Memorandum in Response to Motion to Dismiss Indictment,* Feb. 2, 1990, p. 3.

**38.** *Defendant Noriega's Motion to Dismiss Indictment,* Exhibit "A", p. 1 (March 22, 1990).

**39.** *Id.,* p. 9.

**40.** The Court therefore does not face the task of resolving the exact motives behind the invasion,

a question which may well be beyond its expertise and resources. *See, e.g., Crockett v. Reagan,* 558 F.Supp. 893, 898 (D.D.C.1982) (court lacked resources and expertise to resolve disputed questions of fact concerning presence of imminent hostilities in El Salvador, which existence would implicate War Powers Resolution), *aff'd,* 720 F.2d 1355 (D.C.Cir.1983), *cert. denied,* 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984); *Lowry v. Reagan,* 676 F.Supp. 333, 340 n. 53 (D.D.C.1987) (court unable to determine whether hostile situation existed in Persian Gulf); *Holtzman v. Schlesinger,* 484 F.2d 1307, 1310 (2d Cir.1973) (court lacked expertise to determine whether or not President's bombing of Cambodia constituted a 'tactical decision' within his

That foreign policy objectives rather than just law enforcement goals are implicated radically changes the Court's consideration of the government conduct complained of and, consequently, its willingness to exercise supervisory power. For the question then posed is whether a court may, under the guise of its supervisory authority, condemn armed conflict as "shocking to the conscience." Any such declaration not only runs squarely into the political question doctrine, which precludes courts from resolving issues more properly committed to the political branches, but would indeed constitute unprecedented judicial interference in the conduct of foreign policy.

Although the judiciary clause of the Constitution does not limit the ability of federal courts to adjudicate issues merely because they present political questions, judges have nevertheless defined a category of executive and legislative branch actions as beyond the scope of judicial inquiry ever since the Supreme Court first claimed the power of judicial review in *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 165–66, 2 L.Ed. 60 (1803). The nonjusticiability of political questions is therefore not so much a product of constitutional doctrine but primarily a recognition of the separation of powers and the system of checks and balances provided for in the Constitution. *Baker v. Carr,* 369 U.S. 186, 210, 82 S.Ct. 691, 706, 7 L.Ed.2d 663 (1962).

While the exact contours of the political question doctrine are ambiguous and remain a source of some confusion,[41] the Court is guided by Justice Brennan's oft-quoted formulation of the doctrine in the seminal case of *Baker v. Carr, supra:*

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; [2] or a lack of judicially discoverable and manageable standards for resolving it; [3] or the impossibility of deciding it without an initial policy determination of a kind clearly for nonjudicial discretion; [4] or the impossibility of a court's taking independent resolution without expressing lack of respect due coordinate branches of government; [5] or an unusual need for unquestioning adherence to a political decision already made; [6] or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* at 217, 82 S.Ct. at 710. Under the first prong of the *Baker* formulation—the textual commitment of the issue to a political branch—broad challenges to an Executive's conduct of foreign policy are nonjusticiable since the formulation and execution of foreign policy are constitutionally committed to the executive and legislative branches.[42] In *Johnson v. Eisentrager,* for example, the Supreme Court refused to adjudicate a challenge to United States military activities in China, stating: "[I]t is not the function of the judiciary to entertain private litigation ... which challenges the legality, wisdom, or propriety of the Commander-in-Chief in sending our armed forces abroad or in any particular region." 339 U.S. 763, 789, 70 S.Ct. 936, 94 L.Ed. 1255 (1950). This is not to say that every case or contro-

---

discretion), *cert. denied,* 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974). *See discussion infra.*

**41.** *See Goldwater v. Carter,* 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979); *see also* Henkin, *Is There a "Political Question Doctrine?",* 85 Yale L.J. 597, 622–23 (1976).

**42.** The provisions of the Constitution relating to President's powers in diplomatic and military affairs provide that "[t]he President shall be Commander in Chief of the Army and Navy" (article II, sec. 2, cl. 1); that the President "shall have the power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur" (article II, sec. 2, cl. 2); that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls" (article II, sec. 2, cl. 2); "shall receive Ambassadors and other public Ministers" (article II, sec. 3); and "shall take Care that the Laws be faithfully executed" (article II, sec. 3).

The provisions of the Constitution relating to the war powers of Congress provide that Congress has the power "[t]o declare War;" (article I, sec. 8, cl. 11); and to make laws "necessary and proper for carrying into Execution" its enumerated powers (article I, sec. 8, cl. 18).

versy which touches upon foreign relations is immune from judicial scrutiny. Courts retain the power to determine whether a particular congressional or executive act comes within the bounds of a constitutional grant of authority. In the context of a war or military hostilities such as that present here, for example, the question of possible executive usurpation of Congress's exclusive authority to declare war is clearly a matter for judicial review. *See Atlee v. Laird,* 347 F.Supp. 689, 702 (E.D.Pa.1972), *aff'd,* 411 U.S. 911, 93 S.Ct. 1545, 36 L.Ed.2d 304 (1973); *Crockett v. Reagan,* 558 F.Supp. at 898. The distinction is therefore between justiciable questions of constitutional authority and nonjusticiable broad challenges to the conduct of foreign policy, the resolution of which threatens to entangle the court in the management of foreign affairs.

■ Noriega does not, and legally cannot, allege that President Bush exceeded his powers as Commander-in-Chief in ordering the invasion of Panama. Rather, he asks this Court to find that the deaths of innocent civilians and destruction of private property is "shocking to the conscience and in violation of the laws and norms of humanity." At bottom, then, Noriega's complaint is a challenge to the very morality of war itself. This is a political question in its most paradigmatic and pristine form. It raises the specter of judicial management and control of foreign policy and challenges in a most sweeping fashion the wisdom, propriety, and morality of sending armed forces into combat—a decision which is constitutionally committed to the executive and legislative branches and hence beyond judicial review. Questions such as under what circumstances armed conflict is immoral, or whether it is always so, are not ones for the courts, but must be resolved by the political branches entrusted by the Constitution with the awesome responsibility of committing this country to battle.[43] In this case, the decision to send troops into Panama was made by the President in his capacity as Commander-in-Chief, and he is on this matter "accountable only to his country in his political character, and his own conscience." *Marbury v. Madison,* 5 U.S. (1 Cranch) at 165. The Court has no authority to pass moral judgement upon that decision under the cloak of its supervisory authority.

Defense counsel condemn the military action and the "atrocities" which followed and, having established this argumentative premise, then suggest that such conduct should not be sanctioned by the Court nor should the fruits, i.e., the arrests, of such conduct be permitted. It is further urged that to permit this case to proceed is to give judicial approval to the military action defense counsel condemn. As indicated above, this reasoning fails to recognize the constitutional separation of powers and functions. Any suggestion that rejection of Defendant's position is somehow an approval of governmental conduct described as egregious is misplaced. There are other forums in which complaints about our Government's political activities can be made. To the extent legally permissible by the attendant facts, this Court proposes to try the case within the issues framed by the indictment and the defenses which will be presented by Defendants.

The complexity of the question Noriega poses is further compounded by the lack of judicially discoverable and manageable standards. In *Da Costa v. Laird,* 471 F.2d 1146 (2d Cir.1973), an inductee in the United States Army alleged that President Nixon's orders to bomb targets and mine harbors in North Vietnam constituted an illegal escalation of the war in the absence of congressional authorization. The Second Circuit held that the suit presented a nonjusticiable political question under the second *Baker* prong since the court was incapable of assessing whether the action would escalate the war or hasten its conclusion. Similarly, the court in *Crockett v.*

---

43. *Cf. Greenham Women Against Cruise Missiles v. Reagan,* 591 F.Supp. 1332, 1338 (S.D.N.Y. 1984): "Questions like how to ensure peace, how to promote prosperity, what is a fair utilization and distribution of economic resources are examples of questions that must be decided by the fair, sound, seasoned and mature judgement of men and women responsive to the common good. The power to make these determinations is therefore appropriately allocated to the political branches." *Aff'd,* 755 F.2d 34 (2d Cir.1985).

*Reagan* declined to determine whether U.S. military aid and advisors had been introduced into "imminent hostilities" in El Salvador, thereby implicating the War Powers Resolution and the war powers clause of the Constitution. The court held that it lacked the resources and expertise to resolve disputed questions of fact concerning the military situation in El Salvador and the exact nature of U.S. participation in the conflict. 558 F.Supp. at 898. More recently, the District Court for the Southern District of New York found the lack of judicially discoverable standards sufficient grounds for dismissing as a political question a challenge to the deployment of cruise missiles. Asserting tortious injury and constitutional violations, the plaintiffs contended that the deployment of cruise missiles in Great Britain would create a substantial risk of nuclear war initiated by either the United States or the Soviet Union. By contrast, the government argued that the deployment of the missiles would enhance peace by deterring the Soviet Union from initiating war and by serving as an impetus for arms control negotiation. Faced with this factual dispute, the court declined to reach the merits of the case since the question of whether missile deployment promotes or undermines world peace was simply beyond the court's competence and expertise. *Greenham Women Against Cruise Missiles v. Reagan,* 591 F.Supp. at 1338. *See also Holtzman v. Schlesinger,* 484 F.2d at 1310 (question of whether bombing of Cambodia represented a 'basic change in the situation' which would nullify prior congressional authorization involved "military and diplomatic expertise not vested in the judiciary" and was therefore political).

If the courts are incapable of determining whether bombing constitutes an escalation of war or what the effect of missile deployment is on world peace, it would likewise seem beyond our province to determine whether or under what circumstances war is immoral. What would be the criteria for determining when armed conflict is 'shocking to the conscience'? Defendant's counsel makes much of the numbers of innocent civilians killed and the extent of property damage, but the Court fails to see

what that argument proves; the death of but one woman or man is one too many. Having said that, the Court is here reminded of then Circuit Judge Warren E. Burger's opinion in another case implicating foreign policy concerns:

> That appellants now resort to the courts on a vague and disoriented theory that judicial power can supply a quick and persuasive remedy for one of mankind's great problems is no reason why we as judges should regard ourselves as Guardian Elders ordained to review the political judgements of elected representatives of the people. In framing policies relating to the great issues of national defense and security, the people are and must be, in a sense, at the mercy of their elected representatives. But the basic and important corollary is that the people may remove their elected representatives as they cannot dismiss United States judges. This elementary fact about the nature of our system, which seems to have escaped notice occasionally, must make manifest to judges that we are neither gods nor godlike, but judicial officers with narrow and limited authority. Our entire System of Government would suffer incalculable mischief should judges attempt to interpose the judicial will above that of the Congress and President, even were we so bold as to assume that we can make a better decision on such issues.

*Pauling v. McNamara,* 331 F.2d 796, 799 (D.C.Cir.1963), *cert. denied,* 377 U.S. 933, 84 S.Ct. 1336, 12 L.Ed.2d 297 (1964).

Finally, it is worth noting that even if we assume the Court has any authority to declare the invasion of Panama shocking to the conscience, its use of supervisory powers in this context would have no application to the instant prosecution for the reasons stated. Since the Court would in effect be condemning a military invasion rather than a law enforcement effort, any 'remedy' would necessarily be directed at the consequences and effects of armed conflict rather than at the prosecution of Defendant Noriega for alleged narcotics violations. The Defendant's assumption that judicial condemnation of the invasion must

result in dismissal of drug charges pending against him is therefore misplaced.

In view of the above findings and observations, it is the Order of this Court that the several motions presented by Defendants relating to this Court's jurisdiction as well as that suggesting dismissal under supervisory authority be and each is DENIED.

DONE AND ORDERED.